# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

THE ESTATE OF ZINA LINNIK, and
MIKHAIL and VALENTINA LINNIK, a
married couple, and STANSISLAV M.
LINNIK, and NINA LINNIK, and
MIKHAIL LINNIK, as parent and
guardian for PAVEL LINNIK,
SVETLANA LINNIK, OKSANA LINNIK,
VADIM LINNIK, SAMUEL LINNIK, his
minor children,

Appellants,

v.

STATE OF WASHINGTON, by and
through its various agencies and
subdivisions, including DEPARTMENT
OF CORRECTIONS and CHILD
PROTECTIVE SERVICES, PIERCE
COUNTY, a municipal corporation, and
CITY OF TACOMA,

Respondents.

No. 67475-7-I

DIVISION ONE

UNPUBLISHED

FILED: April 1, 2013

Cox, J. — This wrongful death action arises from the tragedy of Terapon

Adhahn's kidnapping, rape, and murder of Zina Linnik, a twelve year-old child, on

July 4, 2007. Her estate and parents (collectively "the Estate") together with

other members of her family commenced this negligence action against the state

Department of Corrections (DOC), the Department of Social and Health Services

(DSHS), Pierce County, and the City of Tacoma. These defendants moved for summary judgment dismissal, which the trial court granted. Because the Estate fails in its burden to establish that any defendant owed a duty, there are no genuine issues of material fact. We affirm.[1]

The material facts are not in dispute. Adhahn, a lawful permanent resident originally from Thailand, kidnapped, raped, and murdered this twelve-year old child in Tacoma. Seventeen years before these heinous crimes, Adhahn pleaded guilty to first degree incest after raping his half sister. Adhahn received a special sex offender sentence alternative (SSOSA), subject to an exceptional sentence of sixty months of community supervision.

In 1991, Adhahn's community corrections officer (CCO) submitted a Notice of Violation to the court, reporting that Adhahn had failed to enter into sexual deviancy treatment as required by his judgment and sentence. The court entered an agreed order modifying Adhahn's sentence, requiring him to enter into treatment. Adhahn actually began attending group therapy sessions a month before the court entered this order, and he continued to do so.

In September 1992, Adhahn was charged in Tacoma Municipal Court for intimidation with a weapon. The municipal court sentenced him to five days in jail for this misdemeanor.

In 1997, the sex offender treatment provider notified the court that "Adhahn has completed all aspects of the sex offender treatment program with

---

[1] Pierce County moved to strike portions of Brief of Appellant and Reply Brief of Appellant Re: Pierce County. We grant the motion, in part. We do not consider the portions of the Reply Brief that first argue on the basis of RCW 10.70.140. See Engstrom v. Goodman, 166 Wn. App. 905, 911, 271 P.3d 959 (2012).

this agency." On July 8, the superior court held a hearing to determine whether Adhahn had complied with the terms of his alternative sentence at which the prosecutor and Adhahn were present. At the conclusion of this hearing, the court terminated DOC supervision of Adhahn.

Adhahn was classified as a level I sex offender. This is the lowest risk level classification for sex offenders. Adhahn lived in several different locations in Pierce County, but he did not update his sex offender registration when he moved. In 2002, Adhahn was stopped for a traffic infraction and at that point updated his registration. He moved several times between 2002 and the date he raped and murdered the Linnik child.

In January 2004, the Department of Child Protective Services (CPS) received an anonymous report that an unnamed man was living with a young girl whom he had purchased or traded for furniture. Though not clear from this initial call, the authorities later determined that Adhahn was the subject of this report. The CPS worker who screened the initial call referred it to Pierce County law enforcement. When the Pierce County Sheriff's Office received the CPS referral, they sent an officer to investigate. The officer did not find a girl at the address listed in the referral.

About two weeks after the first report, CPS received another call from the anonymous caller. At that point, she provided Adhahn's name to the CPS intake worker. Typically, CPS forwards this updated information to the relevant law enforcement agency. But here, Pierce County claims it never received this second referral with Adhahn's name.

3

In 2007, three years after the report to CPS, Adhahn approached the Linnik child in an alley behind her home, forced her into his grey van, and kidnapped her. The Linnik family called 911 approximately five minutes later, upon realizing that the child was gone. Tacoma law enforcement responded to the scene at 10:00 p.m.

At the outset, Tacoma police targeted an Asian neighbor of the Linniks. The Linnik family reported seeing a vehicle that matched the one owned by their neighbor driven by an Asian man pull away from the alley. Because the police were in pursuit of this suspect, the lead detective decided not to request an AMBER Alert the night of the Linnik child's abduction. The AMBER Alert is a public warning system that broadcasts child abduction information on the radio, television, and highway signs.

The police located and questioned the Linnik's neighbor sometime after midnight and eliminated him as a suspect. At around 4:00 a.m., the lead detective called the Tacoma police's public information officer and requested an AMBER Alert. Tacoma police protocol then required that the public information officer initiate the issuance of an AMBER Alert. After receiving the AMBER Alert request, the Tacoma public information officer fell back asleep. Consequently, he did not initiate the AMBER Alert until later that morning at around 8:00 a.m., some four hours after the request.

Four days after the Linnik child's abduction, Tacoma police detained Adhahn and questioned him regarding the child's disappearance. Adhahn eventually confessed to kidnapping, murdering, and raping the Linnik child.

4

In 2010, the Estate and other family members commenced this action for wrongful death against DOC, DSHS, Pierce County, and the City of Tacoma. The trial court dismissed the claims brought by the Linnik child's siblings and that dismissal is not before us, as counsel properly conceded at oral argument.

The Estate appeals.

## DUTY

The Estate argues that the defendant governmental entities were negligent and liable for the Linnik child's death. We hold that the Estate has failed in its burden to show that any of these entities owed an actionable duty.

In a motion for summary judgment by a defendant, the initial burden is on the moving party "to prove by uncontroverted facts that there is no genuine issue of material fact."[2] "A material fact is one upon which the outcome of the litigation depends . . . ."[3] Bare assertions of ultimate facts and conclusions of fact are insufficient.[4] "Likewise, conclusory statements of fact will not suffice."[5]

If the moving party meets this initial burden of showing an absence of material fact, then the inquiry shifts to the party with the burden of proof at trial.[6] This party must then "'make a showing sufficient to establish the existence of an

---

[2] Young v. Key Pharma. Inc., 112 Wn.2d 216, 235, 770 P.2d 182 (1989).

[3] Barrie v. Hosts of Am., Inc., 94 Wn.2d 640, 642, 618 P.2d 96 (1980).

[4] Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988).

[5] Id.

[6] Young, 112 Wn.2d at 225.

element essential to that party's case, and on which that party will bear the burden of proof at trial."[7]

An appellate court reviews the trial court's order granting summary judgment de novo, reviewing the facts in the light most favorable to the nonmoving party.[8]

To prove an action for negligence, a plaintiff must demonstrate that the defendant owed a duty to him, breached this duty, and that this breach proximately caused the plaintiff's injury.[9] "A cause of action for negligence will not lie unless the defendant owes a duty of care to plaintiff."[10] "Existence of a duty is a question of law. Breach and proximate cause are generally fact questions for the trier of fact."[11]

Where the liability of a governmental entity is at issue, Washington courts "have employed the 'public duty doctrine' to determine whether the duty is one owed to a nebulous public or whether that duty is owed to a particular individual."[12] Because the Washington legislature has made public entities liable

---

[7] Id. at 225 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

[8] Ruvalcaba v. Kwang Ho Baek, 175 Wn.2d 1, 6, 282 P.3d 1083 (2012).

[9] Hertog v. City of Seattle, 138 Wn.2d 265, 275, 979 P.2d 400 (1999).

[10] Chambers-Castanes v. King County, 100 Wn.2d 275, 284, 669 P.2d 451 (1983).

[11] Hertog, 138 Wn.2d at 275.

[12] Honcoop v. State, 111 Wn.2d 182, 188, 759 P.2d 1188 (1988).

"to the same extent as" private persons,[13] "the public duty doctrine does not—cannot—provide immunity from liability."[14] Instead, it is:

> a focusing tool [used] to determine whether a public entity owed a duty to a 'nebulous public' or a particular individual. The public duty doctrine simply reminds us that a public entity—like any other defendant—is liable for negligence only if it has a statutory or common law duty of care. And its 'exceptions' indicate when a statutory or common law duty exists.[15]

Thus, a plaintiff bringing a case against a public entity must show that the entity owed a duty to him, specifically.[16] What differentiates a public entity defendant from other defendants is that the examination of whether it owed a *specific* duty to the plaintiff is particularly stringent.[17] This is because public entities owe general duties to the public at large—they must, for instance, respond to 911 calls and police the streets. But public entities are not negligent for a breach of these general duties.[18]

### State

The Estate argues that DOC and DSHS both owed a duty to the Linnik child under several different theories of negligent liability. Because the Estate cannot demonstrate that either state agency owed the Linnik child a duty, we disagree.

---

[13] RCW 4.92.090.

[14] Osborn v. Mason County, 157 Wn.2d 18, 27, 134 P.3d 197 (2006).

[15] Id. at 27-28 (quoting Taylor v. Stevens County, 111 Wn.2d 159, 166, 759 P.2d 447 (1988)).

[16] Id. at 27.

[17] Id. at 27-28.

[18] Id.

7

*Implied Statutory Duty Under RCW 26.44.050 and .030*

The Estate argues that the state DSHS was negligent because it did not fulfill its implied duties under RCW 26.44.050 and .030, causing the Linnik child's death. We hold that there was no duty to the Linnik child under the circumstances of this case.

RCW 26.44.050 states:

> Upon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department of social and health services must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court.

The supreme court has recognized that under this statute the "State has a statutorily mandated duty to investigate child abuse allegations brought to its attention."[19] This duty had been recognized to flow not only to the child victim of abuse but also to parents whose parental rights are interfered with due to abuse allegations.[20] Thus, in Tyner v. Department of Social and Health Services, the supreme court held that DSHS owed a duty to Tyner, a father who was separated from his children during a child abuse investigation.[21] There, the court implied a cause of action in favor of a parent of a child who was the subject of an investigation under RCW 26.44.050:

> In [Bennett v. Hardy], we outlined when a cause of action will be implied from a statute. The following questions must be asked: "[F]irst, whether the plaintiff is within the class for whose 'especial'

---

[19] Tyner v. Dep't of Social and Health Servs., 141 Wn.2d 68, 77, 1 P.3d 1148 (2000).

[20] Id. at 82.

[21] Id.

benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation."[22]

The Tyner court held that RCW 26.44.050's legislative history made "it clear that a parent's interests were contemplated by the Legislature."[23] It also concluded that the Legislature's emphasis on the close relationship between a child and a parent's interests demonstrated that it intended "a remedy for both the parent and the child if that interest is invaded."[24] And, as the court noted, "RCW 26.44.050 has two purposes: to protect children and preserve the integrity of the family," and thus protection of a parent's rights were explicitly part of the statute's goals.[25]

After Tyner, this state's courts have rejected attempts to broaden the duty implied by RCW 26.44.050. Thus, in Ducote v. Department of Social and Health Services, the supreme court rejected claims from stepparents that DSHS owes them a duty under RCW 26.44.050 for negligent investigation of child abuse.[26]

> RCW 26.44.010 does not designate the bond between a child and his or her stepparent or other family member as one entitled to this same protection. Because the legislature did not designate stepparents as members of the class protected by RCW 26.44.050,

---

[22] Id. at 77-78 (quoting Bennett v. Hardy, 113 Wn.2d 912, 920-21, 784 P.2d 1258 (1990)).

[23] Id. at 78.

[24] Id. at 80.

[25] Id.

[26] 167 Wn.2d 697, 704, 222 P.3d 785 (2009).

Ducote does not have standing to bring a negligent investigation claim.[27]

And, this court in <u>Blackwell v. Department of Social and Health Services</u> held that the implied duty created by RCW 26.44.050 was not owed to foster parents.[28] As in <u>Ducote</u>, this court looked to the language of RCW 26.44.010, which emphasizes the parent-child relationship and does "not include caretakers within that classification."[29]

Similarly, the supreme court has rejected claims of negligent investigation where the plaintiff was not actually investigated for abusing her own child,[30] and where a DSHS investigation, not DSHS placement, led to a child's physical and emotional injuries.[31]

The supreme court has also implied a duty owed by those required to report child abuse under RCW 26.44.030. Under RCW 26.44.030:

> When any. . . employee of [DSHS] . . . has reasonable cause to believe that a child has suffered abuse or neglect, he or she shall report such incident, or cause a report to be made, to the proper law enforcement agency or to the department as provided in RCW 26.44.040.

---

[27] Id. at 704.

[28] 131 Wn. App. 372, 378, 127 P.3d 752 (2006).

[29] Id. at 377.

[30] Roberson v. Perez, 156 Wn.2d 33, 45-46, 123 P.3d 844 (2005).

[31] M.W. v. Dep't of Social and Health Servs., 149 Wn.2d 589, 591, 70 P.3d 954 (2003).

10

In <u>Beggs v. Department of Social and Health Services</u>, the court applied the <u>Bennett</u> "implied cause of action test" to RCW 26.44.030.[32] The court concluded that "*victims of child abuse* are certainly within the class for whose ['especial'] benefit the legislature enacted the reporting statute, as this court has acknowledged."[33]

Here, the Estate attempts to broaden the limited duty the courts have implied from RCW 26.44.050 and .030, arguing that DSHS owed a duty to the Linnik child. Such an argument is unsupported by the case law and by the statute itself. While CPS received a report that a "young girl" had been sold to Adhahn and was living with him, the Linnik child was not the subject of the report. All the cases that have addressed both RCW 26.44.050 and .030 have limited the class of persons who are owed a duty to those *children who are allegedly abused and their parents.*[34]

The first anonymous report to CPS stated that a "young girl" was living and having sex with a 42-year-old man. The DSHS worker who received this call determined that it was a "third party report" and referred it to Pierce County. This was consistent with the requirements of the statute.

The Estate argues that because the girl was reported to be under 16, DSHS's failure to "screen in" the report and investigate it was a violation of DSHS's duty. Even if this were so, DSHS's duty would have been to the child

---

[32] 171 Wn.2d 69, 77-78, 247 P.3d 421 (2011).

[33] <u>Id.</u> at 77 (emphasis added).

[34] <u>Blackwell</u>, 131 Wn. App. at 378.

who was the subject of the referral, not the Linnik child. DSHS owes a duty under RCW 26.44.050 and .030 to a child who is abused and about whom they receive a report. Under this duty, DSHS must non-negligently investigate the report and properly inform law enforcement about it.[35] DSHS never received a report concerning the Linnik child in connection with Adhahn, the alleged abuser. Thus, she was not one to whom DSHS owed a duty under either RCW 26.44.030 or .050.

In arguing that DSHS owed a duty to this child, the Estate relies on Lewis v. Whatcom County.[36] That reliance is misplaced.

There, this court held that upon receipt of a report concerning possible abuse or neglect, Whatcom County owed a duty to Lewis, who was being abused by her uncle.[37] The County argued that "it owed no duty to Lewis because her abuser was her uncle rather than her parent."[38] But the Lewis court rejected this argument.[39] "Nothing in the plain language of this statute, which imposed a duty to investigate on law enforcement, limits that duty to children who have been abused by their parents or guardians. Indeed, it is a broad mandate covering any *report* of possible abuse or neglect."[40] But, nowhere in the Lewis opinion did

---

[35] Tyner, 141 Wn.2d at 77.

[36] 136 Wn. App. 450, 149 P.3d 686 (2006).

[37] Id. at 453-54.

[38] Id. at 453.

[39] Id.

[40] Id. at 454.

12

this court imply that a public entity owes a duty to those children who are *not* the subject of a DSHS report or referral but who are later harmed by a child abuser's actions.

The Estate argues that Lewis held "that both the statutory language and prior Washington case law provided that 'children who may be abused or neglected' were the class protected by the statute." But the Estate does not fully quote the Lewis opinion, distorting the duty it implied. The court stated:

> [t]he trial court granted summary judgment, adopting the County's argument that it owed [] no duty to investigate because the abuse allegations were not against [Lewis's] parent or guardian. But RCW 26.44.050 creates a duty to all children who may be abused or neglected, regardless of the relationship between the child and his or her alleged abuser.[41]

It thus emphasized that RCW 26.44.050 creates a duty to children who may be abused or neglected *about whom a public entity receives a report* and then negligently investigates. Lewis does not stand for the proposition that DSHS owes a duty to *any* child harmed as a result of a report of child abuse or neglect. Nor that DSHS owes a duty to *all* children abused by someone about whom a report has been submitted. Such a reading would obviate the requirement that for a public entity to be negligent, it must have a duty to a *particular person*, not to every citizen or every child.

The Estate also argues that "[r]ather than being arbitrarily limited to the child named in the abuse referral, this duty should instead be limited by" foreseeability. But such an analysis ignores the duty requirement of a negligence

---

[41] Lewis, 136 Wn. App. at 452.

claim and would conflict with the longstanding jurisprudence of this state that we discussed earlier in this opinion.

Because the Estate fails in its burden to show any duty, we need not address whether proximate cause exists.

### "Take Charge" Duty

The Estate argues that the state DOC was negligent because it owed a "take charge" duty to non-negligently supervise and classify Adhahn and its failure to do so proximately caused the Linnik child's death. We hold there is no such duty here.

A public entity may owe a duty to an individual for a third person's criminal act, though this is usually not the case.[42] This duty exists if the entity had a special relationship with the third person and this relationship created a duty to take reasonable precautions to protect anyone who might foreseeably be endangered.[43]

The supreme court first enunciated this "take charge" duty in Petersen v. State.[44] There, the court looked to the Restatement (Second) of Torts § 315.[45] This section echoes the general principle that there is no duty to control the conduct of a third person to prevent him from physically harming another, unless:

---

[42] Robb v. City of Seattle, 159 Wn. App. 133, 142-43, 245 P.3d 242 (2010), review granted, 171 Wn.2d 1024 (2011).

[43] Taggart v. State, 118 Wn.2d 195, 218, 822 P.2d 243 (1992).

[44] 100 Wn.2d 421, 671 P.2d 230 (1983).

[45] Id. at 426-27.

    (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

    (b) a special relation exists between the actor and the other which gives to the other a right to protection.

In <u>Petersen</u>, Larry Knox struck and killed the plaintiff five days after being released from Western State Hospital.[46] The doctor supervising Knox had previously obtained a court order allowing his detention for an additional fourteen days.[47] The evening before Knox's discharge, Knox was "apprehended by hospital security personnel while driving his car on the hospital grounds in a reckless fashion . . . ."[48] Nevertheless, the doctor ordered Knox's discharge.[49] Five days later, he injured Peterson in a car collision.[50]

In the lawsuit that followed, the court held that the Knox's psychiatrist had a "take charge" duty, as enunciated in the Restatement (Second) of Torts § 315, to protect Knox's foreseeable victims because he should have determined that Knox presented a serious danger to others.[51] In doing so, the court relied on a California supreme court decision, <u>Tarasoff v. Regents of University of California</u>.[52] There, Prosenjit Poddar told his psychologist that he planned to kill

---

[46] <u>Id.</u> at 423.

[47] <u>Id.</u> at 424.

[48] <u>Id.</u>

[49] <u>Id.</u>

[50] <u>Id.</u>

[51] <u>Id.</u> at 428-29.

[52] 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976).

Tatiana Tarasoff.[53] Though the campus police briefly detained Poddar, he was released without further action.[54] Two months later, Poddar killed Tarasoff.[55]

Following Tarasoff and Petersen, Washington courts have applied the "take charge" duty to DOC supervision of parolees. In Taggart v. State, the supreme court held that "parole officers have a duty to protect others from reasonably foreseeable dangers engendered by parolees' dangerous propensities."[56] The Taggert court specifically noted that "a duty will be imposed under § 315 *only* upon a showing of a 'definite, established and continuing relationship between the defendant and the third party.'"[57] It went on to conclude that RCW 72.04A.080, the statute governing parolees' supervision, established a 'definite, established and continuing relationship' between parole officers and their parolees.[58] Under RCW 72.04A.080, parolees:

> shall be subject to the supervision of the department of corrections, and the probation and parole officers of the department shall be charged with the preparation of progress reports of parolees and to give guidance and supervision to such parolees within the conditions of a parolee's release from custody.

The court also noted that sections 316 through 320 of the Restatement (Second) of Torts were helpful in identifying where "take charge" duties occur, "in

---

[53] Id. at 430.

[54] Id.

[55] Id.

[56] 118 Wn.2d 195, 224, 822 P.2d 243 (1992).

[57] Id. at 219 (quoting Honcoop, 111 Wn.2d at 193) (emphasis added).

[58] Id.

accordance with the general principle stated in § 315 . . . ."[59] The court

concluded that § 319 was the most relevant in the context of parolees.[60] Section

319 states, "One who takes charge of a third person whom he knows or should

know to be likely to cause bodily harm to others if not controlled is under a duty

to exercise reasonable care to control the third person to prevent him from doing

such harm."[61]

In Hertog v. City of Seattle, the supreme court extended this "take charge"

duty as expressed under § 319 to probation counselors and pretrial release

counselors.[62] It held that probation counselors owed such a duty because they

are "clearly in charge of monitoring the probationer to ensure that conditions of

probation are being followed, and [have] a duty to report violations to the court."[63]

Pretrial release counselors, too, the Hertog court held, have a "take charge" duty

because they are charged with reporting the violations of those they monitor.[64]

While the Taggart court recognized that DOC may owe a "take charge"

duty to one injured by a parolee, the supreme court has also limited the extent of

this duty. In Osborn v. Mason County, the plaintiff claimed that the county had a

duty under the "take charge" doctrine to warn others of a sex offender's

---

[59] Id.

[60] Id. at 219-20.

[61] RESTATEMENT (SECOND) OF TORTS, § 319 (1965).

[62] 138 Wn.2d 265, 281, 292, 979 P.2d 400 (1999).

[63] Id. at 279.

[64] Id. at 287-88.

presence.[65] The court rejected this claim, holding "Mason County did not 'take charge' of [the sex offender] because it had no authority to control him."[66]

Similarly, in <u>Couch v. Department of Corrections</u>[67] and <u>Hungerford v. Department of Corrections</u>,[68] both of which involved the same felon, Anthony Davis, Division Two of this court held that DOC did not have a "take charge" relationship with Davis.[69] At the time that Davis murdered Couch and Hungerford, DOC:

> had authority to monitor Davis for legal financial obligations *only*, it lacked authority to monitor Davis for future criminal behavior; and if DOC lacked the ability to monitor Davis for future criminal behavior, it was not participating in a "take-charge" relationship of the kind that <u>Taggart</u> and its progeny require.[70]

Here, as in <u>Couch</u>, <u>Hungerford</u>, and <u>Osborn</u>, DOC had no "take charge" duty to Adhahn's victims at the time that the Linnik child was murdered. The last time that it had such control over Adhahn and an accompanying duty was in July 1997, ten years prior to the Linnik child's murder. That was when DOC supervised Adhahn as part of his SSOSA sentence for his 1990 incest conviction. This supervision ended at that time when the court entered its Order Terminating Treatment and Supervision. Under <u>Taggart</u> and its progeny, DOC

---

[65] 157 Wn.2d 18, 23-24, 134 P.3d 197 (2006).

[66] <u>Id.</u> at 25.

[67] 113 Wn. App. 556, 54 P.3d 197 (2002), <u>review denied</u>, 149 Wn.2d 1012 (2003).

[68] 135 Wn. App. 240, 139 P.3d 1131 (2006), <u>review denied</u>, 160 Wn.2d 1013 (2007).

[69] <u>Id.</u> at 246, <u>Couch</u>, 113 Wn. App. at 571.

[70] <u>Couch</u>, 113 Wn. App. at 571 (emphasis added).

no longer had any ability to control Adhahn's actions after termination of supervision, or any special relationship with him. Thus, it owed no duty to the Linnik child thereafter.

The Estate argues that "[i]t is not the law . . . that a take-charge duty terminates when the take-charge relationship does." It then points to what it argues was DOC's negligent supervision of Adhahn from 1990 to 1997, arguing that these actions breached DOC's duty which it owed to the Linnik child, a foreseeable victim. It cites Petersen to support its contention that a public entity that breaches its duty during the "take charge" period may be liable for injuries after the period has ended.

But, as the Taggart court noted, in Petersen, "the patient who caused the plaintiff's injuries was released from the hospital, where the psychiatrist *had a high degree of control over him* . . . ."[71] Taggart and its progeny have noted that, in the context of duties owed by DOC, the degree of control and supervision it has over an individual is critical for ascertaining whether there is a "take charge" duty.[72]

Here, after July 1997, DOC had no control over Adhahn, and thus no duty to his future victims. Further, in Petersen, only five days separated the patient's

---

[71] Taggart, 118 Wn.2d at 222.

[72] Id., Aba Sheikh v. Choe, 156 Wn.2d 441, 453, 128 P.3d 574 (2006) ("The mere existence of some ability to control a third party is not the dispositive factor in determining whether a take charge duty exists; rather, the purpose and extent of such control defines the relationship for purposes of tort liability.").

release from Western State Hospital and his causing Petersen's injuries.[73] In

Tarasoff, two months separated the specific threat from the negligent act.[74] No

case cited by the Estate or that we could find applies the duty to any substantially

longer period of time. Here, ten years separated the court's termination of DOC's

supervision and the Linnik child's murder. Thus, Petersen is distinguishable.

In addition to Petersen, the Estate relies on several out-of-state cases to

support its contention that a "take charge" duty does not terminate when a "take

charge" relationship does. None of these cases are helpful, even if we chose to

ignore the clear lines of authority that our state cases provide.[75]

As with Petersen, two of these cases deal with the "take charge" duty in

the mental health context.[76] In the third case, Smith v. Hope Village, Inc., the

court applied the principles of duty that have developed in the District of

Columbia, which are broader than those that Washington courts have

expressed.[77] Thus, Smith is not helpful.

The Estate argues that DOC negligently supervised Adhahn when it did

have a "take charge" relationship with him. But, even if DOC did negligently

supervise Adhahn during that period, this supervision ended ten years prior to

---

[73] Petersen, 100 Wn.2d at 423.

[74] Tarasoff, 17 Cal. 3d at 430.

[75] See Am. Best Food, Inc. v. Alea London Ltd., 168 Wn.2d 398, 408, 229 P.3d 693 (2010) (noting that "persuasive out-of-state precedent should not trump binding in-state law").

[76] Estates of Morgan v. Fairfield Family Counseling Ctr., 77 Ohio St. 3d 284, 673 N.E.2d 1311, 1332 (OH 1997); Littleton v. Good Samaritan Hosp. & Health Ctr., 39 Ohio St. 3d 86, 529 N.E.2d 449, 455 (OH 1988).

[77] 481 F. Supp. 2d 172, 186-87 (D.C. Dist. 2007).

Adhahn's murder of the Linnik child. Thus, any negligent supervision from 1990 to 1997 has no impact on our analysis.

Finally, the Estate argues that holding that DOC's "take charge" duty ends when it terminates supervision is contrary to public policy. Public policy, as expressed in the controlling decisions that we discussed earlier in this opinion refutes this claim, which is unsupported by any citation to authority.

Because there was no duty of DOC to take charge of Adhahn after the court terminated its supervision, we need not reach the question of proximate cause.

### Pierce County

The Estate next argues that Pierce County owed a duty to the Linnik child under several different theories, and that its breach of this duty proximately caused her death. We disagree.

### "Take Charge" Duty

First, the Estate claims that the County had a "take charge" duty to monitor Adhahn's sex offender registration and that its failure to do so proximately caused Linnik's death. We reject this argument.

As noted above, public entities have a "take charge" duty when there is a "'definite, established and continuing relationship between the defendant and the third party.'"[78] Thus, in Taggart, the supreme court held that DOC had a "take charge" duty with respect to parolees.[79] In doing so, it looked to the language of

---

[78] Taggart, 118 Wn.2d at 219 (quoting Honcoop, 111 Wn.2d at 193) (quotation marks omitted).

[79] Id. at 223-24.

21

RCW 72.04A.080, which states that parolees "shall be subject to the *supervision* of the department of corrections . . . ."[80] Similarly, in Hertog, the court held that, though a probation counselor lacks the ability to take full custodial control of the parolee that is not the key question.[81] "The relevant inquiry is the relationship of the officer with the parolee. A probation counselor is clearly in charge of monitoring the probationer to ensure that conditions of probation are being followed, and has a duty to report violations to the court."[82]

Here, the Estate argues that RCW 9A.44.135 imposes a "take charge" duty on counties to monitor sex offenders residing within their borders. The plain language of this statute belies this claim. Under RCW 9A.44.135(2):

> The chief law enforcement officer of the jurisdiction where the offender has registered to live shall make *reasonable attempts to locate* any sex offender who fails to return the verification form or who cannot be located at the registered address.
>
> If the offender fails to return the verification form or the offender is not at the last registered address, the chief law enforcement officer of the jurisdiction where the offender has registered to live shall promptly forward this information to the county sheriff and to the Washington state patrol for inclusion in the central registry of sex offenders.[83]

The statute requires the chief law enforcement officer to make reasonable attempts to locate a sex offender. If an offender fails to return a verification form, the law enforcement officer must then forward the offender's information to the

---

[80] Id. at 219 (emphasis added).

[81] Hertog, 138 Wn.2d at 276-77.

[82] Id. at 279.

[83] (Emphasis added.)

22

county sheriff and the Washington state patrol. There is no language in this statute that states or implies that the chief law enforcement officer in Pierce County has a duty to take charge of anyone under this statute.

Indeed, the supreme court has already decided that there is no such duty under this statute. In Osborn, the court rejected the plaintiff's claim that the county had a "take charge" duty to warn others of a sex offender's presence, holding "Mason County did not 'take charge' of Rosenow because it had no authority to control him."[84]

The Estate argues that, because of Adhahn's history, it was foreseeable that he would reoffend and thus the county owed a "take charge" duty to all other inhabitants to control Adhahn. But, as discussed above, the county had no statutory right to control him, nor any duty to do so. Without a duty, we need not address the question of foreseeability.[85]

Additionally, the Estate contends that Pierce County owed a separate "take charge" duty to the Linnik child to report Adhahn's presence to immigration officials when Adhahn was in the County's custodial control. In 1992, Adhahn served five days in the Pierce County jail. But, Pierce County had no reason to know that Adhahn, more than any other inmate in its jails, was a danger to a third person. Thus, this argument fails.

---

[84] Osborn, 157 Wn.2d at 25.

[85] See Halleran v. Nu West, Inc., 123 Wn. App. 701, 717, 98 P.3d 52 (2004) (noting that foreseeability limits the scope of the duty, but does not independently create a duty).

23

The Estate also argues that the report the County received from DSHS regarding Adhahn "strengthened" its "take charge" duty. But this argument fails as there was no duty to "strengthen."

Because the Estate cannot demonstrate duty, we need not reach proximate cause.

### Implied Duty Under RCW 26.44.050 and .030

The Estate also argues that the County owed a duty under RCW 26.44.050 and .030. We disagree.

As discussed previously in this opinion, the supreme court has recognized an implied duty owed to abused and neglected children and to parents under RCW 26.44.050 and .030.[86] Since recognizing this duty, the court has continuously limited to whom this duty is owed.[87] Here, because the Linnik child was not a subject of such a referral, the County owed no duty *to her* to investigate any reports it received regarding Adhahn.

Because Pierce County owed no duty to the Linnik child under these statutes, we need not address proximate cause.

### Failure to Enforce Exception – RCW 9A.44.135

The Estate also claims that the County owed it a duty to enforce the requirements of RCW 9A.44.135. We reject this claim.

---

[86] Tyner, 141 Wn.2d at 77-78.

[87] Ducote, 167 Wn.2d at 704; Blackwell, 131 Wn. App. at 378.

24

The "failure to enforce exception" is another of the focusing tools that our courts have enunciated with respect to public entity liability.[88] It applies "where governmental agents responsible for enforcing statutory requirements possess actual knowledge of a statutory violation, fail to take corrective action despite a statutory duty to do so, and the plaintiff is within the class the statute intended to protect."[89] This duty applies "only where there is a *mandatory duty* to take a *specific action to correct a known statutory violation*."[90] Thus, "[s]uch a duty does not exist if the government agent has broad discretion about whether and how to act."[91]

In Bailey v. Town of Forks, the supreme court held that Forks owed Bailey a duty under the failure to enforce exception.[92] There, Bailey was injured after an intoxicated motorcyclist collided with her truck.[93] Prior to the accident, a Forks police officer had contact with the motorcyclist and knew or should have known that the motorcyclist was intoxicated.[94] The court held that under RCW 46.61.515 and 70.96A.120(2), "a police officer has a statutory duty to take into

---

[88] Bailey v. Town of Forks, 108 Wn.2d 262, 268, 737 P.2d 1257 (1987).

[89] Id. at 268.

[90] Donohoe v. State, 135 Wn. App. 824, 849, 142 P.3d 654 (2006) (emphasis added).

[91] Halleran, 123 Wn. App. at 714.

[92] 108 Wn.2d 262, 269, 737 P.2d 1257 (1987).

[93] Id. at 263.

[94] Id. at 264-65.

custody a publicly incapacitated individual."[95] The court also noted that the police officer "took no corrective action and possessed *actual knowledge* of [the motorcyclist's] statutory violations."[96]

Here, the Estate argues that the County breached a duty by failing to enforce RCW 9A.44.135. But, in contrast to Bailey, RCW 9A.44.135 does not create a mandatory duty for the County to act. As previously discussed, the plain words of the statute state that the chief law enforcement officer of a jurisdiction "shall *make reasonable attempts* to locate any sex offender who fails to return the verification . . . ."[97] Nowhere does this statute require law enforcement to act in a specific way once the express requirements of the stature are met.

Because RCW 9A.44.135 does not mandate law enforcement take a specific action to verify sex offenders' addresses, it does not create a mandatory duty. Thus, we reject the Estate's argument.

*Tacoma*

The Estate also argues that Tacoma owed a duty to the Linnik child under the rescue doctrine and RCW 26.55.050. We disagree.

*Rescue Doctrine*

First, the Estate argues that because Tacoma issued an AMBER Alert more than 10 hours after Linnik was reported missing, it assumed a duty to warn

---

[95] Id. at 269.

[96] Id.

[97] RCW 9A.44.135(2) (emphasis added).

or come to Linnik's aid and did so negligently, proximately causing her death. We disagree.

As enunciated in Bailey, a public entity may owe a duty to an individual plaintiff, and thus may be liable for negligence, "when governmental agents fail to exercise reasonable care after assuming a duty to warn or come to the aid of a particular plaintiff (rescue doctrine)."[98] Under this doctrine, a person "may be liable for attempting a voluntary rescue *and making the plaintiff's situation worse* if that person (1) increases the danger; (2) misleads the plaintiff into believing the danger has been removed; or (3) deprives the plaintiff of possible help from others."[99] As the supreme court noted, "reliance is the linchpin of the rescue doctrine."[100]

In Osborn, the supreme court held that Mason County did not owe the plaintiff a duty under the rescue doctrine because "the Osborns did not rely on Mason County's assurances."[101] There, a Mason County detective told one county resident that he would post fliers notifying the community that a registered sex offender had moved into the area.[102] He never spoke with Osborn.[103] The detective failed to post any fliers, and the sex offender raped and murdered

---

[98] Bailey, 108 Wn.2d at 268.

[99] Ganno v. Lanoga Corp., 119 Wn. App. 310, 316, 80 P.3d 180 (2003).

[100] Osborn, 157 Wn.2d at 25; see also Chambers-Castanes, 100 Wn.2d at 285 n.3 (noting that under the rescue doctrine a governmental entity may be liable where "the offer to render aid is relied upon by either the person to whom the aid is to be rendered or by another . . . .").

[101] Id. at 25.

[102] Id. at 21.

[103] Id.

27

Osborn.[104] The court held that Mason County did not owe Osborn a duty and thus was not negligently liable for her death.[105]

> [T]he Osborns do not claim Mason County promised to warn them of [the sex offenders] presence.
>
> . . . .
>
> . . . [T]he Osborns relied on neither Mason County nor [the police officer] to warn them of [the sex offenders] presence. Accordingly, Mason County had no duty to warn the Osborns under the rescue doctrine.[106]

The court noted that, "[u]nder the rescue doctrine, both public and private, entities have a duty to warn those who reasonably rely on a promise to warn. But no duty to warn exists under the rescue doctrine without reasonable reliance on such a promise."[107]

Here, the Estate could not reasonably rely on a promise made by Tacoma to issue the AMBER Alert within a specific time. Nowhere in the record does the Estate claim that Tacoma assured the Linniks that it would issue an AMBER Alert. Thus, the Estate cannot demonstrate that it detrimentally relied on Tacoma with specific regard to the AMBER Alert. Because detrimental reliance is an essential element of the rescue doctrine, the Estate cannot demonstrate that Tacoma owed it a duty under this theory.

---

[104] Id.

[105] Id. at 23-26.

[106] Id. at 26-27.

[107] Id. at 28.

The Estate argues that "[i]ssuance of an Amber Alert is a rescue attempt," because its goal, as defined by the U.S. Department of Justice, is to "instantly galvanize the entire community to assist in the search for and safe recovery of the child."[108] But, this is essentially a claim for negligent investigation.

"A claim for negligent investigation is not cognizable under Washington law."[109] This is because "[a] mandatory duty to investigate . . . would be completely open ended as to priority, duration, and intensity. . . . Law enforcement must be vested with broad discretion to allocate limited resources among the competing demands."[110]

As Tacoma notes, an AMBER Alert galvanizes the entire community to assist in the *"police investigation"* in the search and safe recovery of an abducted child. Thus, to argue that an AMBER Alert was issued negligently is to argue that a police investigation was negligent. This is not a cognizable claim.[111]

The Estate also relies on Brown v. MacPherson's Inc.[112] and Folsom v. Burger King,[113] arguing that these cases support its position that Tacoma owed it a duty. They do not.

---

[108] Brief of Appellants at 40-41.

[109] Fondren v. Klickitat County, 79 Wn. App. 850, 862, 905 P.2d 928 (1995).

[110] Donaldson v. City of Seattle, 65 Wn. App. 661, 671-72, 831 P.2d 1098 (1992).

[111] Id. at 671; Fondren, 79 Wn. App. at 862.

[112] 86 Wn.2d 293, 545 P.2d 13 (1975).

[113] 135 Wn.2d 658, 958 P.2d 301 (1998).

In Brown, two plaintiffs sued the State of Washington for injuries to life and property sustained after an avalanche. The State "was specifically warned of the extreme hazard of avalanche danger" on the plaintiffs' property but failed to communicate this warning to any of the known owners and occupants of the property.[114] The supreme court held that the trial court incorrectly dismissed the suit against the State.[115] In so holding, the court relied on the fact that the State's failure to inform the property owners of the avalanche danger may have prevented the property owners from other aid or assistance.[116] Thus, the State's actions may have "increase[d] the risk of harm to those" it was trying to assist.[117]

Here, in contrast to Brown, the issuance of an AMBER Alert, tardy as it was, did not cause others to refrain from acting, nor did it increase the risk of harm to the Linnik child. In the absence of Tacoma's issuance of the AMBER Alert, the Linnik child would not have received further aid from others. Thus, whether it was issued four hours after Tacoma police initially requested did not increase the risk of the harm to the Linnik child.

Nor does Folsom alter our analysis. There, the court outlined the principles of the rescue doctrine, holding that the respondents in the case owed no duty to Folsom. The court stated that "[a] person who undertakes, albeit gratuitously, to render aid to or warn a person in danger is required by

_____

[114] Brown, 86 Wn.2d at 295-96.

[115] Id. at 299.

[116] Id.

[117] Id.

Washington law to exercise reasonable care in his or her efforts."[118] But, the court continued, noting that only if "a rescuer fails to exercise such care and *consequently increases the risk of harm to those he or she is trying to assist*" is there a duty under this doctrine.[119] Here, Tacoma did not increase the risk of harm to the Linnik child, as noted above. Thus, Folsom is not helpful.

*Restatement (Second) of Torts Section 302B*

Finally, the Estate argues that the State, Pierce County, and Tacoma all owed it a duty because they all acted affirmatively and exposed the Linnik child to an unreasonable risk of harm from a third party. They rely on Restatement (Second) of Torts § 302B. We hold that the Estate cannot demonstrate that any of the respondents owed it or the Linnik child a duty under § 302B.

In Parrilla v. King County, the supreme court recognized that a duty of care could be compelled by § 302B.[120] This section provides: "An action or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal."[121] The comments to the section go on to note that:

> [t]here are . . . situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him

---

[118] Folsom, 135 Wn.2d at 676.

[119] Id.

[120] 138 Wn. App. 427, 439, 157 P.3d 879 (2007).

[121] RESTATEMENT (SECOND) OF TORTS, § 302B (1965).

31

against such intentional misconduct; *or where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account.*[122]

Two cases have found a duty owed by a public entity under § 302B: Parrilla and Robb v. City of Seattle.[123] In Parrilla, a bus driver affirmatively acted by leaving a passenger on a running bus.[124] The passenger was "exhibiting bizarre behavior, including acting as if he were talking to somebody outside of the vehicle although nobody was there, yelling unintelligibly, and striking the windows of the bus with his fists."[125] The driver left the bus, and the passenger then moved into the driver's seat and drove the bus into several vehicles.[126] The court held that:

> the bus driver left the bus with the engine running next to the curb of a public street, with [a disturbed passenger] on board. Significantly, the bus driver was fully aware that [the passenger] was acting in a highly volatile manner. . . . Furthermore, . . . the 14-ton bus here was a vehicle uniquely capable of inflicting severe damage. The risk of harm arising from the criminal operation of such a vehicle was recognizably high. Moreover, the bus was stolen by [the passenger] mere moments after it was left unattended, not at a remote future time by an unknown individual . . . .[127]

---

[122] Id. (emphasis added).

[123] 159 Wn. App. 133, 245 P.3d 242 (2010), vacated, ___ Wn.2d ___, 295 P.3d 212 (2013).

[124] Parrilla, 128 Wn. App. at 431.

[125] Id.

[126] Id. at 430.

[127] Id. at 440.

Similarly, in <u>Robb</u> this court held that the evidence in that case would support a duty instruction based on § 302B.[128] There, Samson Berhe shot and killed Michael Robb.[129] Before murdering Robb, Berhe had twice been taken to Harborview Hospital for a mental evaluation at the request of his family, who were afraid for their safety.[130] And, during the week in which he shot Robb, police learned that Behre "was again engaging in bizarre and aggressive behavior and that he possessed a shotgun."[131] Finally, the day of Robb's murder, Berhe was detained by two Seattle police officers.[132] During the detention, the officers "noticed yellow shotgun shells on the curb next to where Berhe was standing."[133] They then released Berhe.[134] The officers took control of the situation and then departed from it, "leaving shotgun shells lying around within easy reach of a young man known to be mentally disturbed and in possession of a shotgun."[135] This court held that, given the Seattle Police Department's knowledge of Berhe's erratic and violent behavior, a jury could find

---

[128] <u>Robb</u>, 159 Wn. App. at 135.

[129] <u>Id.</u>

[130] <u>Id.</u> at 136.

[131] <u>Id.</u>

[132] <u>Id.</u>

[133] <u>Id.</u> at 137.

[134] <u>Id.</u>

[135] <u>Id.</u> at 147.

that the officers' affirmative acts created a recognizable and extremely high risk of injury to a third person.[136]

In contrast to Parrilla and Robb, in Tae Kim v. Budget Rent A Car Systems, Inc., the supreme court held that Budget owed no duty under § 302B to Peter Kim.[137] There, Kim was injured by a Budget vehicle after Demicus Young stole the car and ran a red light, severely injuring the plaintiff.[138] The car had been left in the Budget lot with the keys in the ignition, and Kim argued that Budget should have foreseen the theft of this car and possible injury of others.[139] The court rejected this argument. Section 302B, the court noted, "does not mean that any risk of harm gives rise to a duty. Instead, an *unusual risk of harm*, a 'high degree of risk of harm,' is required."[140]

Here, the Estate fails to identify any specific affirmative acts of any of the defendants that could have foreseeably resulted in Linnik's death. That is because, as in Kim, there were none.

Because none of the respondents undertook any identifiable affirmative acts that would imply a duty under § 302B, the Estate cannot demonstrate that they were negligent.

---

[136] Id.

[137] 143 Wn.2d 190, 194, 15 P.3d 1283 (2001).

[138] Id. at 194.

[139] Id. at 195.

[140] Id. at 196 (emphasis added).

*General Negligence*

In addition to arguing that each governmental entity breached the specific duties we have already discussed in this opinion, the Estate also argues that these entities were more generally negligent. It also argues that "neither duties nor causation may be parsed out act by act—instead, the defendants' negligence must be considered as a whole." We reject these assertions.

The Estate relies on Osborn and Robb to argue a more general duty of negligence. Neither case supports its argument.

The supreme court's holding in Osborn, emphasized the need for a particularized duty.[141] As we have previously noted, there, a Mason County police officer failed to distribute fliers notifying the community of a level three registered sex offender's presence in the community.[142] The court held that Mason County owed no *particularized* duty to the Osborns because the police officer never promised them it would distribute these fliers.[143] Thus, the duty that Mason County owed to the Osborns was no different from the duty it owed to the public at large.[144]

Nor does this court's opinion in Robb alter this duty analysis. There, this court held that summary judgment was inappropriate where Seattle could have

---

[141] Osborn, 157 Wn.2d at 27-28.

[142] Id. at 21.

[143] Id. at 23-26, 28.

[144] Id. at 28.

breached a particularized duty it owed to Robb.[145] This duty resulted from law enforcement's *specific* affirmative act that they should have reasonably known would create a risk of injury.[146] The court stated "[i]f a risk is foreseeable, an individual generally has a duty to exercise reasonable care to prevent it."[147]

But, foreseeabilty does not obviate the need to first establish a duty owed to the plaintiff by the defendant. As the supreme court recently stated, "[w]hen a duty is found to exist from the defendant to the plaintiff then concepts of foreseeability serve to define the scope of the duty owed."[148] Thus, "[i]t is not . . . the unusualness of the act that resulted in injury to plaintiff that is the test of foreseeability, but whether the result of the act is within the ambit of the hazards covered by the *duty imposed* upon [the] defendant."[149]

The Estate argues that "the existing exceptions" to the public duty doctrine that our courts have outlined "do not exhaust the universe of liability for public entity defendants." This is true. But the Estate must still demonstrate that each public entity it charges with negligence had a specific duty to it, rather than a general duty to the public as a whole. It has failed to do so.

---

[145] Robb, 159 Wn. App. at 147.

[146] Id. at 142.

[147] Id.

[148] Michaels v. CH2M Hill, Inc., 171 Wn.2d 587, 608, 257 P.3d 532 (2011) (quoting Schooley v. Pinch's Deli Market, Inc., 134 Wn.2d 468, 475, 951 P.2d 749 (1998)) (alteration in original).

[149] Rikstad v. Holmberg, 76 Wn.2d 265, 269, 456 P.2d 355 (1969) (emphasis added).

## ESTATE'S MOTION TO RECONSIDER OR AMEND

The Estate argues that the trial court abused its discretion when it denied its Motion to Reconsider Striking Briefing on RCW 26.44.050, or in the Alternative, Plaintiffs' Motion to Amend Complaint. We disagree.

CR 15(a) provides that "[a] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." An appellate court reviews a trial court's denial of a motion to amend for an abuse of discretion.[150] A court should freely grant leave to amend, unless doing so would result in prejudice to the nonmoving party.[151] "In determining whether prejudice would result, a court can consider potential delay, unfair surprise, or the introduction of remote issues" as well as the futility of the amendment.[152]

Here, the court denied the Estate's supplemental briefing on the duty Tacoma owed the Estate under RCW 26.44.050, as well as its motion to reconsider this decision or, in the alternative, to allow it to amend its complaint. This was not an abuse of discretion. As Tacoma correctly argued below and on appeal, the Estate's argument under RCW 26.44.050 was futile. As discussed

---

[150] Karlberg v. Otten, 167 Wn. App. 522, 529, 280 P.3d 1123 (2012).

[151] Caruso v. Local Union No. 690 of Int'l Bhd. of Teamsters, 100 Wn.2d 343, 350, 670 P.2d 240 (1983).

[152] Kirkham v. Smith, 106 Wn. App. 177, 181, 23 P.3d 10 (2001); Haselwood v. Bremerton Ice Arena, Inc., 137 Wn. App. 872, 889, 155 P.3d 952 (2007); see Doyle v. Planned Parenthood of Seattle-King County, Inc., 31 Wn. App. 126, 131, 639 P.2d 240 (1982) ("In addition to timeliness, the court may consider the probable merit or futility of the amendments requested."); see also Ino Ino, Inc. v. City of Bellevue, 132 Wn.2d 103, 142, 937 P.2d 154 (1997) (holding that denial of motion to amend was not abuse of discretion because it was both untimely and "would have been futile").

above, RCW 26.55.040 has been interpreted by the courts to imply a duty owed to *children and their parents who are abused or neglected*, about whom law enforcement has received reports.[153] Because Linnik is not within the group of people to whom this duty is owed, Tacoma owed no duty to her under this statute, and any argument that it did is futile. Thus, the lower court's denial of the Estate's motion was not an abuse of discretion.

The Estate argues that because Washington is a notice pleading state, and because its complaint against Tacoma set forth a general theory of recovery, it was an abuse of discretion for the court not to allow amendment. But, this argument does not address the fact that any argument that Tacoma had a duty to Linnik under RCW 26.44.050 was futile. Thus, it is not helpful.

We affirm the summary judgment orders dismissing the claims.

_____
Cox, J.

WE CONCUR:

_____          _____

---

[153] Tyner, 141 Wn.2d at 77-78.