[No. 63299-0-I.   Division One.   December 27, 2010.]

ELSA ROBB, *as Personal Representative, Respondent*, v. THE CITY OF SEATTLE ET AL., *Petitioners.*

*Peter S. Holmes, City Attorney,* and *Rebecca Boatright, Assistant,* for petitioner.

*Elizabeth W. Perka, Matthew R. Kenney,* and *Timothy G. Leyh* (of *Danielson Harrigan Leyh & Tollefson LLP*), for respondents.

¶1 BECKER, J. — A little after 7:30 p.m. on June 26, 2005, 17 year old Samson Berhe was walking down Southwest Marginal Way in Seattle, carrying a long gun case. He flagged down a car, put a shotgun in the window, and shot the driver, Michael Robb, in the face. Charged with first degree murder, Berhe was later committed to Western State Hospital as not guilty by reason of insanity. This appeal concerns the wrongful death action brought by Robb's wife against the city of Seattle and two Seattle police officers, Kevin McDaniel and Ponha Lim. Seattle unsuccessfully moved for summary judgment based on the public duty doctrine. The trial court concluded that even though none of the recognized exceptions to the public duty doctrine were applicable, the evidence would support an instruction based on *Restatement (Second) of Torts* § 302B (1965). We affirm.

¶2 Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The court considers the evidence in the light most favorable to the nonmoving party. *Osborn v. Mason County*, 157 Wn.2d 18, 22, 134 P.3d 197 (2006).

¶3 Viewed in the light most favorable to Robb, the record shows that in May 2004, officers in the Southwest Precinct of the Seattle Police Department twice took Berhe to Harborview Medical Center for a mental evaluation at the request of his parents, who were afraid for the family's safety because of Berhe's erratic and destructive behavior. In June 2005, during the week before Berhe randomly selected Michael Robb as the target of his shotgun blast, precinct officers learned that Berhe was again engaging in bizarre and aggressive behavior and that he possessed a shotgun.

¶4 On June 19, 2005, Officers McDaniel and Lim, and another officer responded to a call from Berhe's mother. According to his mother, Berhe had a history of mental illness and was making suicide threats. The officers described Berhe as unresponsive and "acting strange." Berhe was taken to Harborview Medical Center.

¶5 On June 22, Officer Lim and another officer responded to a 911 call about an assault at Berhe's home. Berhe had been punching one of his brother's friends. When the officer approached, Berhe "spoke in normal tones then switched to deep demonic tones." He stated that he "ruled the world," that "all confused people need to be killed and tortured," and that "I control all the money" and "I'll kill all the haters." The officers took Berhe to Harborview Medical Center for an involuntary mental health evaluation. The mental health professional released Berhe because the boy he assaulted declined to testify at a hearing. Berhe's parents were afraid of him and refused, at least initially, to let him come home.

¶6 On June 21, the auto theft division of Seattle police received information from Bellevue police that Berhe had recently stolen a car and was keeping shotguns under his

bed at home. The Bellevue police had been informed of this by Berhe's friend, Raymond Valencia, who they had recently arrested for car theft.

¶7 On June 24, Berhe's father called police to report that Berhe and Valencia were in the backyard fighting and they both had shotguns. Numerous officers from the Southwest Precinct responded. By the time they arrived, the two boys and the shotguns were gone.

¶8 On June 26, in the morning, two officers questioned and released Berhe and Valencia at a vacant rental home on Berhe's street where they had spent the night sleeping and drinking beer until being discovered by the owner.

¶9 On June 26, late in the afternoon, Officer McDaniel responded to a report of a burglary about three miles from Berhe's home. He learned from a witness that Berhe and Valencia were "bragging about knowing where stolen items were being kept." Officer McDaniel and Officer Lim located Valencia and Berhe on a street near Berhe's home and stopped them on suspicion of the burglary. Berhe was "very agitated." The officers patted down the two youths to check for weapons but found none. Upon finding a stolen watch in Valencia's pocket, they took him into custody and put him in a police car.

¶10 The officers noticed yellow shotgun shells on the curb next to where Berhe was standing. It is a disputed issue of fact whether McDaniel and Lim personally knew or should have known that Berhe possessed a shotgun. For purposes of summary judgment, we assume they were aware of the information about Berhe gathered by fellow officers during the three days preceding this burglary stop. The officers did not ask any questions about the shotgun shells they saw lying on the ground, and they did not confiscate the shells. They released Berhe and told him to go home. Berhe walked away, making "incoherent comments." The officers drove away with Valencia.

¶11 A neighbor who was watching these events saw Valencia throw down some shotgun shells before being

stopped. After the police left with Valencia, another witness saw Berhe come back, bend down, pick something up, and walk away. A short time later, Berhe stopped to see his neighbors and showed them a handful of yellow shotgun shells. He said he had a shotgun and was bragging about "popping off rounds all night."

¶12 Berhe fatally shot Michael Robb about two hours later at a location reachable by walking a short distance along a trail through a wooded area just to the north of Berhe's home.

¶13 After the murder, Valencia took investigating officers to a place in the woods where Berhe had set up a makeshift shooting range. Searching the area, officers found 11 empty shell casings, 1 unused shotgun shell, and an empty 20 shell box. Valencia also made a statement admitting that he and Berhe committed a burglary investigated by officers from Seattle's Southwest Precinct on June 19, in which guns and ammunition were stolen. He said they sold most of the stolen property, but Berhe insisted on keeping one of the shotguns.

¶14 Elsa Robb filed this lawsuit in January 2008. Seattle moved for summary judgment. The trial court denied the motion:

> The question presented by the defendants' Motion for Summary Judgment is whether the allegedly negligent actions of the officers who contacted Samson Berhe and Raymond Valencia on 6/26/05 were affirmative acts negligently performed or more appropriately considered as failures to act. If the latter, then the public duty doctrine bars this action. *Coffel v. Clallam County*, 47 Wn. App. 397, 403[, 735 P.2d 686] (1987). If the former, then Restatement (Second) of Torts § 302B (1965) and comment "a" thereto is applicable and may provide a remedy. It is undisputed that none of the recognized exceptions to the public duty doctrine apply here to allow its use in this negligence action. *Cummins v. Lewis County*, 156 Wn.2d 844, 852-53[, 133 P.3d 458] (2006).
>
> Applying the summary judgment standard, the plaintiff has produced sufficient evidence of affirmative acts negligently

performed by defendants that a duty may be found to exist as a matter of law pursuant to Restatement (Second) of Torts § 302B.

¶15 The trial court certified its order for discretionary review under RAP 2.3(b)(4), and we accepted the certification. The main thrust of Seattle's argument on discretionary review is that as a matter of law, a police officer owes no duty actionable in tort unless one of the four recognized exceptions to the public duty doctrine is present. Seattle also contends that *Restatement (Second) of Torts* § 302B does not state a duty.

¶16 "The essential elements of a negligence action are (1) the existence of a duty to plaintiff; (2) breach of that duty; (3) resulting injury; and (4) proximate cause between the breach and the injury." *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 220, 802 P.2d 1360 (1991). "The threshold determination in a negligence action is whether a duty of care is owed by the defendant to the plaintiff." *Taylor v. Stevens County*, 111 Wn.2d 159, 163, 759 P.2d 447 (1988). The existence of a duty is a question of law for the court. *Hutchins*, 116 Wn.2d at 220.

¶17 Seattle's argument that section 302B "does not itself create a duty" is inconsistent with *Hutchins*. There, our Supreme Court discussed section 302B comment e(G) as a permissible basis for liability in certain situations where a defendant's property creates an especial temptation and opportunity for criminal misconduct. *Hutchins*, 116 Wn.2d at 230.

¶18 As a beginning point, section 302 recognizes the possibility of a duty to guard another person against a foreseeable risk of harm caused by a third person:

Risk of Direct or Indirect Harm

A negligent act or omission may be one which involves an unreasonable risk of harm to another through either

(a) the continuous operation of a force started or continued by the act or omission, or

(b) the foreseeable action of the other, a third person, an animal, or a force of nature.

RESTATEMENT (SECOND) OF TORTS § 302. Sections 302A and 302B go on to refine the parameters of the duty depending on whether the actor's conduct involves a risk that another person will act with negligence or recklessness (section 302A) or the risk that another person will engage in intentional or criminal conduct (section 302B). Robb's theory of negligence is based on section 302B comment e:

> Risk of Intentional or Criminal Conduct
>
> An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.
>
> . . . .
>
> *d.* Normally the actor has much less reason to anticipate intentional misconduct than he has to anticipate negligence. In the ordinary case he may reasonably proceed upon the assumption that others will not interfere in a manner intended to cause harm to anyone. . . .
>
> . . . .
>
> *e.* There are, however, situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct; *or where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account.*

RESTATEMENT (SECOND) OF TORTS § 302B cmts. d, e (emphasis added).

¶19 Our Supreme Court discussed section 302B comment e as a possible source of duty in *Tae Kim v. Budget Rent A Car Sys., Inc.*, 143 Wn.2d 190, 15 P.3d 1283 (2001). The plaintiff was a victim of vehicular assault committed by a third party with a car stolen from the parking lot of an administrative facility belonging to Budget Rent A Car. The

keys had been left in the ignition. The court concluded that the recognizable degree of risk of harm created by leaving the keys in the ignition in this particular area was not high enough to justify imposition of a duty under section 302B:

> As comment e to the section explains, a duty to guard against third party conduct may exist where there is a special relationship to the one suffering the harm, or "where the actor's own affirmative act has created or exposed the other to a *recognizable high degree of risk of harm* through such misconduct, which a reasonable [person] would take into account." RESTATEMENT (SECOND) OF TORTS § 302B cmt. e (1965) (emphasis added). This does not mean that any risk of harm gives rise to a duty. Instead, an unusual risk of harm, a "high degree of risk of harm," is required. *Id.* There is nothing in the facts of this case indicating that a *high degree* of risk of harm to plaintiff was created by Budget's conduct of leaving the keys in the ignition of an automobile in an area where Budget had never had a prior vehicle theft.

*Kim*, 143 Wn.2d at 196.

¶20 After *Kim*, this court reinstated a case based on section 302B comment e in *Parrilla v. King County*, 138 Wn. App. 427, 436, 157 P.3d 879 (2007). In *Parrilla*, two passengers were fighting on a Metro bus in Seattle. The driver pulled over and directed all passengers to disembark. Eventually all passengers left the bus except one. The driver observed the final passenger, Carpenter, acting erratically. The driver got out of the bus and left the engine running with Carpenter still on board. Carpenter drove the bus away and crashed into and injured the Parrillas. Their negligence suit against King County was dismissed in the trial court for lack of duty. In defending the appeal by the Parrillas, the county argued that section 302B was not intended to give rise to a duty of care—the same argument that Seattle makes in this case. We rejected that argument:

> King County initially argues that the only circumstances that may give rise to a duty to guard against the criminal conduct of a third party, pursuant to Washington case law, are those in which the actor has a "special relationship" with either

the criminal third party or with the party exposed to that criminal conduct. This is not the law.

As a general rule, "every actor whose conduct involves an unreasonable risk of harm to another 'is under a duty to exercise reasonable care to prevent the risk from taking effect.'" *Minahan v. W. Wash. Fair Ass'n*, 117 Wn. App. 881, 897, 73 P.3d 1019 (2003) (quoting RESTATEMENT (SECOND) OF TORTS § 321 (1965)). A risk is "unreasonable" pursuant to that principle only if a reasonable person would have foreseen it. *Minahan*, 117 Wn. App. at 897. Accordingly, the existence of a duty turns on the foreseeability of the risk created. *Higgins v. Intex Recreation Corp.*, 123 Wn. App. 821, 837, 99 P.3d 421 (2004) (quoting *Rasmussen v. Bendotti*, 107 Wn. App. 947, 956, 29 P.3d 56 (2001)). If a risk is foreseeable, an individual generally has a duty to exercise reasonable care to prevent it. *Minahan*, 117 Wn. App. at 897. If a risk is not foreseeable, an actor generally has no duty to prevent it. *Rikstad v. Holmberg*, 76 Wn.2d 265, 456 P.2d 355 (1969); *Higgins*, 123 Wn. App. at 837 (quoting *Rasmussen*, 107 Wn. App. at 956).

It is true that an actor ordinarily owes no duty to protect an injured party from harm caused by the criminal acts of third parties; *see, e.g.*, *Morehouse v. Goodnight Bros. Constr.*, 77 Wn. App. 568, 571, 892 P.2d 1112 (1995); *Kim*, 143 Wn.2d at 194-95; *see also Tortes v. King County*, 119 Wn. App. 1, 7, 84 P.3d 252 (2003) ("[A] person is normally allowed to proceed on the basis that others will obey the law."). The rationale for this rule is that criminal conduct is usually not reasonably foreseeable. *Bernethy* [*v. Walt Failor's, Inc.*], 97 Wn.2d [929,] 934[, 653 P.2d 280 (1982)]; RESTATEMENT (SECOND) OF TORTS § 302 B cmt. d.

Accordingly, Washington cases finding the existence of a duty to guard against the criminal conduct of a third party have generally been based on reasons other than the foreseeability of such conduct. As the court in *Kim* explained, such cases have, instead, justified the imposition of such a duty based on the existence of a "special relationship" between either the actor and the victim, or between the actor and the criminal third party. *Kim*, 143 Wn.2d at 196-97; *see, e.g., Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 943 P.2d 286 (1997) (business owed duty to invitee to protect against criminal conduct of third party); *Hertog v. City of Seattle*, 138 Wn.2d 265, 979 P.2d 400 (1999) (state owed duty to individual harmed by the criminal conduct of probationer under state's supervision).

However, criminal conduct is not unforeseeable as a matter of law. *Bernethy*, 97 Wn.2d at 934. Thus, in keeping with the general rule that an individual has a duty to avoid reasonably foreseeable risks, if a third party's criminal conduct is reasonably foreseeable, an actor may have a duty to avoid actions that expose another to that misconduct. *Bernethy*, 97 Wn.2d at 934 (citing *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 321, 255 P.2d 360 (1953)). As our Supreme Court explained:

> Whether or not an intervening act is criminal in nature, is a fact to be considered in determining whether such act was reasonably foreseeable. But intervening criminal acts may be found to be foreseeable, and if so found, actionable negligence may be predicated thereon.

*McLeod*, 42 Wn.2d at 321. The rule articulated by section 302 B and adopted by the court in *Kim* is consistent with that principle. It allows the imposition of a duty only when the risk of harm is recognizable, and only when a reasonable person would have taken the risk into account.

Thus, King County's contention that a duty to guard against the criminal conduct of a third party may arise only when there exists a special relationship between either the actor and the criminal third party, or between the actor and the victim of that criminal conduct, fails.

King County next asserts, referencing *Restatement (Second) of Torts* section 302 comment a, that section 302 B was not intended to give rise to a duty of care, but only to explain when an already-existing duty has been breached. That comment provides:

> This Section is concerned only with the negligent character of the actor's conduct, and not with his duty to avoid the unreasonable risk. In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act. The duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation

between the actor and the other which gives rise to the duty. . . . If the actor is under no duty to the other to act, his failure to do so may be negligent conduct within the rule stated in this Section, but it does not subject him to liability, because of the absence of duty.

RESTATEMENT (SECOND) OF TORTS § 302 cmt. a. However, the quoted comment cautions only that the section does not de scribe a rule giving rise to a duty on the part of an individual whose *failure* to act exposes another to harm. In regard to the duties of one who undertakes an *affirmative act,* the comment merely restates the general rule that actors are "under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act." RESTATEMENT (SECOND) OF TORTS § 302 cmt. a. The interpretation of section 302 B advanced by the Parrillas, that a duty of care may arise pursuant to that section where an actor's affirmative act has created or exposed another to a recognizable high degree risk of harm, is entirely consistent with that general principle.

In the present case, it is an affirmative act, rather than a failure to act, that is at issue. The bus driver affirmatively acted by leaving Carpenter alone on board the bus with its engine running.

*Parrilla*, 138 Wn. App. at 435-38 (footnotes omitted).

¶21 Consistent with *Hutchins, Kim,* and *Parrilla,* we conclude that *Restatement (Second) of Torts* § 302B cmt. e is recognized in Washington as a source of duty. It is not merely an overlay explaining how an actor can breach a duty defined elsewhere.

¶22 Seattle contends, however, that even if section 302B gives rise to a duty of care owed by a private actor, it does not apply to conduct of a governmental actor because of the "immunity" conferred by the public duty doctrine.

¶23 To say that the public duty doctrine confers "immunity" fundamentally misstates the law. The Washington

Legislature has *abolished* sovereign immunity. Municipalities, "whether acting in a governmental or proprietary capacity, shall be liable for damages arising out of their tortious conduct, . . . to the same extent as if they were a private person or corporation." RCW 4.96.010. Just as if Seattle were a private person or corporation, its liability to Robb depends upon whether the duty of the officers to protect Robb from the criminal acts of Berhe was distinct from their general responsibility to protect the public from the criminal acts of others. Far from carving out a special immunity for municipalities, the public duty doctrine expresses and affirms this overarching principle of tort law. *Taylor*, 111 Wn.2d at 163; *Osborn*, 157 Wn.2d at 27-28.

¶24 Over time, our courts have identified four "exceptions" to the public duty doctrine—legislative intent, failure to enforce, rescue, and special relationship. *Bailey v. Town of Forks*, 108 Wn.2d 262, 268, 737 P.2d 1257, 753 P.2d 523 (1987). Robb does not contend that her case fits any of these exceptions and instead bases her theory of negligence entirely on *Restatement (Second) of Torts* § 302B cmt. e. Seattle maintains that the public duty doctrine bars Robb's negligence action because none of the four exceptions to the doctrine are present. Seattle cites no authority to support this categorical statement. If a private actor can owe a duty under section 302B, as a consequence of the abolition of sovereign immunity the same must be true of a governmental actor. Seattle raises the spectre of unlimited governmental liability, but the limitations supplied by *Restatement (Second) of Torts* § 302 and its comments provide focus to the duty of protection owed in connection with affirmative acts.

¶25 When governmental actors are defendants, courts must take care to ensure that the duty allegedly breached was actually owed to the injured person as an individual. Drawing that line can be difficult, especially where the defendants are police officers whose everyday mission is to protect the public from the criminal acts of others—a mission that routinely brings them into contact with se-

verely impaired and dangerous individuals. Drawing the line accurately, however, would be impeded by accepting Seattle's rigid framework wherein the duty of a governmental actor is determined solely by resort to the public duty doctrine and the four recognized exceptions.

¶26 Exceptions to the public duty doctrine " 'generally embody traditional negligence principles.' " *Osborn*, 157 Wn.2d at 28 (quoting *Bishop v. Miche*, 137 Wn.2d 518, 530, 973 P.2d 465 (1999)). Used as focusing tools, they help to ensure that courts do not inadvertently assume that an obligation inherent in the job description of a governmental actor is the same as an actionable duty in tort. The public duty doctrine thus reminds us that municipalities are not to become liable for damages to a greater extent than if they were a private person or corporation.

¶27 *Restatement (Second) of Torts* § 302B also embodies traditional negligence principles. It describes limited circumstances in which an actor has a duty to protect another against third party conduct intended to cause harm. There must be a "recognizable high degree of risk of harm," evidence of which was found lacking in *Kim* and in *Hutchins* but present in *Parrilla*. The risk must be one that a reasonable person would take into account. And as comment e explains, these situations arise where the actor has a special relationship to the one suffering the harm or "where the actor's own affirmative act has created or exposed the other" to the high degree of risk of harm. RESTATEMENT (SECOND) OF TORTS § 302B cmt. e.

¶28 This is an affirmative acts case. Precedent for analyzing a claim involving affirmative acts by police officers without considering the four exceptions of the public duty doctrine is found in *Coffel*, 47 Wn. App. at 403. In *Coffel*, there was a dispute about ownership of a building. Officers were called when one of the disputants took a sledgehammer to the building, in which a tenant was operating a business. In the resulting lawsuit for destruction of property, this court determined the officers would face no liability to the extent the suit was based on their failure to

protect the property. This was because the statutory and common law duties to provide police protection are "owed to the public at large and [are] unenforceable as to individual members of the public." *Coffel*, 47 Wn. App. at 402. But some of the officers "took affirmative action" to prevent the tenant from protecting his own property. We allowed the negligence suit to proceed against those officers, reasoning that the public duty doctrine "provides only that an individual has no cause of action against law enforcement officials for failure to act. Certainly if the officers do act, they have a duty to act with reasonable care." *Coffel*, 47 Wn. App. at 403; *cf.* RESTATEMENT (SECOND) OF TORTS § 302 cmt. a ("In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act. The duties of one who merely omits to act are more restricted.").

¶29 The closest precedent supporting Robb's theory of negligence is *Parrilla*, which Robb contends is analogous to her case. We agree. In *Parrilla*, the defendant bus driver was aware that "an instrumentality uniquely capable of causing severe injuries was left idling and unguarded within easy reach of a severely impaired individual." *Parrilla*, 138 Wn. App. at 440-41. It should not be surprising that tort liability can be imposed for such conduct. Similarly, it should not be surprising that tort liability can be imposed if officers take control of a situation and then depart from it, leaving shotgun shells lying around within easy reach of a young man known to be mentally disturbed and in possession of a shotgun. A jury could find that the affirmative acts of the officers in connection with the burglary stop created the risk of Berhe coming back for the shells and using them intentionally to harm someone, a risk that was recognizable and extremely high. Under these circumstances, the officers owed Robb a duty in tort to protect against Berhe's criminal misconduct.

¶30 Affirmed.

DWYER, C.J., and APPELWICK, J., concur.