GROSS, J.
These appeals arise from a tragic event — Michael and Carole Merhige’s 35-year-old son, Paul, shot and killed family members at a Thanksgiving gathering in Jupiter, Florida. Following the shooting, representatives of the victims’ estates sued the Merhiges, collectively alleging negligence.[1] The circuit court dismissed the complaints for failure to state a cause of action. We affirm the ruling of the circuit court that the Merhiges owed no legal duty to their family members in this case, so that an essential element of a negligence cause of action is missing.
In reviewing an appeal from an order granting a motion to dismiss for failure to state a cause of action, we accept the factual allegations of the operative complaints as true and consider them in the light most favorable to the plaintiffs/appellants. See Fla. R. Civ. P. 1.140(b)(6); Seminole Tribe of Fla. v. Times Pub. Co., 780 So.2d 310, 311-12 (Fla. 4th DCA 2001).
On November 26, 2009, appellants Muriel and Jimmy Sitton hosted a yearly *1142 Thanksgiving dinner for sixteen family members. While the Merhiges regularly attended the gathering, their son Paul did not; in fact, just one year prior, the event’s then-host, Dr. Antoine Joseph, told the Merhiges that he would cancel the dinner if they brought their son with them.
Such intrafamily strife derived from Paul’s history of irrational violence. By 1994, when Paul was twenty years old, he began showing signs of “chronic violence,” including “display[s of] aggressive behavior” and “social disfunction.” He performed “extremely violent and aggressive acts” and communicated “threats of violence ... toward members of his immediate and extended family.” Two years later, as Paul’s “violent and aggressive behavior” continued to manifest, he was deemed “legally disabled.”
From 1994 through 2006, Paul lived with the Merhiges in their home and became financially dependent upon them. During this period, law enforcement officers were called to the Merhiges’ residence on at least ten separate occasions, each time the result of Paul’s “extremely violent and aggressive acts and expressed threats of violence.” Many of these encounters with law enforcement included incidents where Paul “verbally threatened violence against another, physically attacked another, discharged or threatened to discharge a firearm, [and] refused to take his prescribed psychotropic medications.”
Paul’s inner turmoil boiled over to such an extent that he was involuntarily committed under Florida’s Baker Act three times. In 1999, he attempted suicide by shooting himself in the chest.
An aspect of Paul’s hostility was his repeated acts of actual or threatened violence against certain family members. Notably, Paul felt a great “hatred and grudge” toward his uncle, appellant Dr. Joseph, on the deranged belief that Dr. Joseph “somehow caused him illness, injury or damage.” Similarly, Paul “harbored deep resentment and jealousy” toward his sisters, resulting in repeated episodes of violence so significant that one of his sisters obtained a restraining order against him, although it was later revoked.[2]
Due to Paul’s propensity for violence, the Merhiges “supervised, controlled, directed and managed the manner in which [Paul] lived, including ... providing for and controlling [Paul’s] accommodations, mental health treatment, transportation, ... and available spending money.” Nevertheless, despite knowing of Paul’s deficiencies and his previous suicide attempt, the Merhiges did nothing to prevent him from purchasing firearms with the money they provided for him.
Because of Paul’s behavior, the Merhig-es, in early 2009, “excluded” Paul from their home and procured a condominium unit for him in Miami. In the ensuing months, Paul “became extremely reclusive, avoiding contact with others and refusing” to allow anyone other than a housekeeper to enter the condominium. The housekeeper monitored Paul’s actions and reported to the Merhiges that Paul had ceased his mental health treatment and had otherwise stopped taking his “heavy doses of prescribed medication.”
Despite Paul’s recent reclusiveness, his well-documented history of violence, and the rejection of his company just one year prior, the Merhiges invited their son to the Sittons’ Thanksgiving dinner without warning the hosts or Dr. Joseph. Upon being told of the event, Paul expressed interest and repeatedly asked for the par *1143 ty’s details, including who would be in attendance and when everyone would be leaving. Specifically, Paul asked whether his sisters and his uncle, Dr. Joseph, would be attending.
In the moments before the Thanksgiving dinner, appellee Carole Merhige expressed concern regarding Paul’s attendance. In one instance, she told an unnamed witness that she hoped Paul “would not kill everyone” at the dinner party. Likewise, she told her daughter, Lisa, “I hope he [Paul] doesn’t come and Mil us all tonight”; Lisa responded by telling her mother not to tell her father because he “would get upset that [they] had such ideas.”
On the fateful Thanksgiving night, after the Merhiges arrived, Paul called his father, appellee Michael Merhige, to ask for directions; Michael complied. Shocked by this unanticipated predicament, appellant Muriel Sitton immediately confronted her mother, Mrs. Joseph, and asked whether she knew Paul was attending; Mrs. Joseph, however, was equally surprised.
When Paul arrived, neither Dr. Joseph nor any of the guests impeded his entry into the home. Initially, everything seemed fine. The family ate dinner together. Paul innocuously left to get something from his car.
Upon returning to the gathering, Paul brandished a firearm and shot Mrs. Joseph, killing her instantly. He then opened fire on his direct relatives, killing both of his sisters, Carla and Lisa, while seriously wounding his brother-in-law, Patrick Knight. After unjamming his gun, Paul left the dining room and went upstairs, where he shot the Sittons’ six-year-old daughter point blank, killing her as she slept in her bedroom.

Procedural Posture

A criminal prosecution was resolved by a plea bargain and Paul was sentenced to life imprisonment. The appellants, representing the victims’ estates, brought separate negligence suits against the Merhiges. The first case was initiated by the Sittons, on behalf of their six-year-old daughter, and Dr. Joseph, on behalf of his wife. The second was brought by Patrick Knight, for the injuries he personally sustained and as personal representative for the estate of his late wife, Lisa. Although the parties were represented by separate attorneys, both suits were premised upon similar legal theories.
Through eight counts, the Knight complaint, in essence, attempted to base the Merhiges’ negligence upon two predicates. First, the complaint alleged that the Mer-higes created a “foreseeable zone of risk,” and failed to exercise prudent foresight, by surreptitiously inviting Paul to the Thanksgiving dinner, all the while knowing that their son had made “specific threats of violence against those in attendance.” Second, invoking the “undertaker’s doctrine,” Knight alleged that the Merhiges “assumed a duty to serve as [Paul’s] custodian and had a special relationship with” Paul, which they breached by failing to provide adequate “supervision, guidance, control, direction, security, monitoring and management of his person.”
Similarly, the Sitton complaint alleged that the Merhiges created a “foreseeable zone of risk” by purposefully concealing their dinner invitation to Paul despite having such “superior knowledge of [his] likelihood to do harm” that they could “specifically fores[ee] the type of ... harm which ultimately occurred.” Alternatively, the complaint posited that the Merhiges maintained a “special relationship” with Paul given their “familial ties” and the fact that they completely supported him.

Dismissal of the Complaints

After the filing of amended complaints, the circuit court, upon proper motion, dis *1144 missed the complaints with prejudice, finding that the Merhiges had no legal duty to control the actions of their emancipated son. In so ruling, the trial court held that since the allegations failed to adequately establish either a “special relationship” with the victims or the Merhiges’ ability to “control” their son’s behavior, the appellants could not overcome the general rule that “there is no duty to control the conduct of a third person to prevent him from causing physical harm to another.” Furthermore, the court held, as a matter of law, that the Merhiges “did not create a dangerous situation by inviting their son to the gathering” since Paul was not under their control and “had his own free will.”

I

As their primary issue on appeal, the appellants argue that the trial court erred in dismissing their complaints since the Merhiges’ invitation to Paul to the family gathering “created” a foreseeable zone of risk, given his propensity for violence toward certain family members. In making this argument, the appellants characterize the issue of a legal duty as one of foreseeability and nothing more, that a plaintiffs interests are entitled to legal protection whenever a personal injury is a foreseeable consequence of a defendant’s conduct.
Recognizing that this is a case where plaintiffs seek to impose liability upon defendants for the criminal acts of a third party, we reject this approach for two reasons. First, the imposition of a legal duty in this type of case is tied to either a special relationship between the plaintiff and defendant or the defendant’s control over the premises where the injury occurred, the instrumentality causing the injury, or the person causing the injury. Second, even assuming that the issue of legal duty is one of foreseeability alone, untethered to any special relationship or issue of control, public policy reasons warrant a denial of liability where a defendant’s conduct involves the inclusion of an adult family member into the extended family circle.
“[W]hether a complaint is sufficient to state a cause of action is an issue of law subject to de novo review.” Vaughn v. Boerckel, 20 So.3d 443, 445 (Fla. 4th DCA 2009) (citing Siegle v. Progressive Consumers Ins. Co., 819 So.2d 732, 734 (Fla.2002)). While we are limited to the complaints’ four corners and must accept all allegations as true, see Someplace New, Inc. v. Francois, 51 So.3d 1215, 1216 (Fla. 4th DCA 2011), we are “not required to defer to the trial court’s conclusions regarding the legal sufficiency of the allegations.” Aguila v. Hilton, Inc., 878 So.2d 392, 395 (Fla. 1st DCA 2004).

II

A traditional analysis of a defendant’s liability in negligence for the criminal acts of another links the existence of a legal duty to the defendant’s special relationship to the injured party or to the defendant’s ability to control some aspect of the criminal act. Under this traditional analysis, the circuit court correctly determined that the Merhiges violated no legal duty owed to the appellants.
A negligence cause of action is comprised of four elements; the first is a “duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks.” Clay Elec. Co-op., Inc. v. Johnson, 873 So.2d 1182, 1185 (Fla.2003) (citation omitted). With regard to this element, whether a duty exists is a question of law for the court. Goldberg v. Fla. Power & Light Co., 899 So.2d 1105, 1110 (Fla.2005). Crucial to the duty inquiry is “whether the defendant’s conduct foreseeably create[s] a *1145 broader ‘zone of risk’ that poses a general threat of harm to others.” McCain v. Fla. Power Corp., 593 So.2d 500, 502 (Fla.1992). “[T]he zone of risk created by a defendant defines the scope of the defendant’s legal duty and the scope of the zone of risk is in turn determined by the foreseeability of a risk of harm to others.” Smith v. Fla. Power & Light Co., 857 So.2d 224, 229 (Fla. 2d DCA 2003).
“Generally, there is no duty to control the conduct of a third person to prevent [that person] from causing physical harm to another.” Carney v. Gambel, 751 So.2d 653, 654 (Fla. 4th DCA 1999); see also Boynton v. Burglass, 590 So.2d 446, 448 (Fla. 3d DCA 1991) (“Florida courts have long been loathe to impose liability based on a defendant’s failure to control the conduct of a third party.”).
However, there are limited exceptions to this general rule. A defendant’s liability for the criminal acts of third parties is often linked to a “special relationship” with the plaintiff. See T.W. v. Regal Trace, Ltd., 908 So.2d 499, 503 (Fla. 4th DCA 2005); Estate of Rotell ex rel. Rotell v. Kuehnle, 38 So.3d 783, 790-91 (Fla. 2d DCA 2010) (Altenbernd, J., concurring) (observing that in a negligence action, it is a “relationship” that justifies “the creation of a legal duty”). These “relationships are protective by nature, requiring the defendant to guard his charge against harm from others.” W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 56, at 383 (5th ed. 1984); see also Dan B. Dobbs, The Law of Torts §§ 322-329 (2000). For example, a common carrier has a legal duty toward its passengers to exercise reasonable care to prevent physical attacks by third persons. See Hall v. Seaboard Air Line Ry. Co., 84 Fla. 9, 93 So. 151, 153-54 (1921). A “landlord has a duty to protect a tenant from reasonably foreseeable criminal conduct.” Salerno v. Hart Fin. Corp., 521 So.2d 234, 235 (Fla. 4th DCA 1988). A rental car company has a duty to warn its customers of “foreseeable criminal conduct.” Shurben v. Dollar Rent-A-Car, 676 So.2d 467, 468 (Fla. 3d DCA 1996). Other examples of recognized special relationships include businesses toward their customers,[3] employers toward their employees,[4] jailers toward their prisoners,[5] hospitals toward their patients,[6] and schools toward their pupils.[7] See Gar *1146 rison Ret. Home Corp. v. Hancock, 484 So.2d 1257, 1261 (Fla. 4th DCA 1985); Prosser and Keeton on the Law of Torts § 56, at 383.
In this case, there was no recognized special relationship between the Merhiges and the plaintiffs that gave rise to a legal duty to protect them from Paul’s conduct. In general, family members owe no heightened obligation to protect other adult family members from each other.
Absent a special relationship between a defendant and a plaintiff, a duty to protect a plaintiff from “the conduct of a third party may [also] arise if the defendant is in actual or constructive control of: (1) the instrumentality of the harm; (2) the premises upon which the tort is committed; or (3) the person who committed the tort.” Aguila, 878 So.2d at 398; Daly v. Denny’s, Inc., 694 So.2d 775, 777 (Fla. 4th DCA 1997); Vic Potamkin Chevrolet, Inc. v. Horne, 505 So.2d 560, 562 (Fla. 3d DCA 1987) (en banc), approved, 533 So.2d 261 (Fla.1988); see also Dobbs, §§ 329-332. Neither appellant contends that the Merhiges maintained control over the instrumentality (firearm) or the premises (the Sittons’ home).
Focusing on parents’ control over their adult children, we held in Carney that parents “may not be held legally responsible for the conduct of their emancipated, adult child.” 751 So.2d at 654. We observed that where liability has been imposed on the parent for the conduct of a child, “the duty to exercise control is limited to a minor child.... Certainly, where there is no legal right to control a child, there can be no liability imposed on the parent.” Id. (citations omitted); see also Lott v. Goodkind, 867 So.2d 407, 408-09 (Fla. 3d DCA 2003) (holding that an adult murderer was not in the “custody” of his mother, who therefore owed no legal duty to the victim with respect to her son’s conduct). “No Florida decision has imposed liability upon the parents of an adult child for intentional acts simply because the child may be financially dependent on, or needs to reside with, his or her parents.” Carney, 751 So.2d at 654.
Appellant Sitton posits that Carney left open the possibility “that parents of an emancipated adult could be held responsible for an adult child’s actions” when it cited to Thorne v. Ramirez, 346 So.2d 121, 122 (Fla. 3d DCA 1977), as holding that “absent allegations that [the] adult child was insane or mentally deficient, a complaint that sought to hold the parents of the child liable for an intentional tort was properly dismissed.” Id. (emphasis added).
Although addressed in neither Carney nor Thorne, such liability is controlled not by parental status but by the Restatement (Second) of Torts § 319 (1965), which imputes a “special relationship” when “[o]ne ... takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled.” See Garrison, 484 So.2d at 1261 (adopting section 319); United States v. Comstock, 560 U.S. 126, 142, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010) (clarifying that this exception derives as a common law principle). Given the law’s reluctance to impose a duty for nonfeasance, the “take charge” requirement of section 319 has generally been limited to “the context of professional custodians with special competence to control the behavior of those in their charge.” Kaminski v. Town of Fairfield, 216 Conn. 29, 578 A.2d 1048, 1051 (1990). Accordingly, in Florida, such liability has “typically been imposed on *1147 persons having someone committed to their legal custody, such as a jailer or superintendent of a residential institution which has the ability to control the actions of its residents.” Lott, 867 So.2d at 408.
While the depraved nature of Paul’s mind is unquestioned, there were no allegations that the Merhiges exhibited sufficient “control” over Paul’s actions so as to place him within the functional equivalent of their “legal custody.” That the Merhig-es financially provided for Paul and could “control” whether to invite him to family gatherings is insufficient to generate a legal duty on their part to protect those attending the Thanksgiving dinner from Paul. Holding otherwise would stack an untenable burden upon the already difficult lives of parents trying to assist their mentally defective, yet otherwise independent, adult children.

III

The appellants read McCain to apply an analysis unburdened by concepts of a special relationship or control. Rather, they contend that post-McCain, the issue of legal duty is solely determined by whether a defendant’s conduct foreseeably created a broader zone of risk that poses a general threat of harm to others, untethered to any consideration of a special relationship or control. Under this approach, foreseeability is everything and legal duty is but a minimal legal threshold requirement for opening the courthouse door. Even if, under McCain, the tragedy that befell the appellants was a foreseeable result of the Merhiges’ conduct, we would decline to find the existence of a legal duty for public policy reasons.
There is some authority for this focus on the creation of a foreseeable zone of risk as the sole trigger of a legal duty. The Restatement (Second) of Torts § 302B (1965) “recognizes the possibility of a duty to guard another person against a foreseeable risk of harm caused by a third person,” Robb v. City of Seattle, 159 Wash.App. 133, 245 P.3d 242, 244 (2010), reversed on other grounds by 176 Wash.2d 427, 295 P.3d 212 (2013), providing in full:[8]
An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.
Id. at 245.
Crucial to the case at hand, section 302B’s Comment e. posits two situations when an actor “ ‘is required to anticipate and guard against the intentional, or even criminal, misconduct of others’: (1) ‘where the actor’s own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account,’ or (2) where the actor is under a special responsibility to the victim.” United States v. Stevens, 994 So.2d 1062, 1067 (Fla.2008) (quoting Restatement (Second) of Torts § 302B cmt. e (1965)) (emphasis added). The Third Restatement has since expounded upon the impact of Comment e. when taken in conjunction with the “special relationship” exceptions outlined in section 315, stating:
Section 315 of the Restatement Second of Torts contributed to frequent judicial pronouncements ... that absent a spe *1148 cial relationship an actor owes no duty to control third parties. Section SI 5, however, must be understood to address only an affirmative duty to control third parties. It did not address the ordinary duty of reasonable care with regard to conduct that might provide an occasion for a third party to cause harm. The Restatement Second of Torts § 302B, Comment e, provides for a duty of care when “the actor’s own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such [third-party] misconduct.” Section 449 of the Second Restatement also contemplated liability, without regard to any special relationship, for acts that are negligent because of the risk of the third party’s conduct.
Restatement (Third) of Torts: Phys. & Emot. Harm § 37 cmt. d. (2012) (emphasis added). Thus, since section 302B is “concerned only with the negligent character of the actor’s conduct, and not with his duty to avoid the unreasonable risk,” a defendant who creates an “unreasonable risk” through his or her own misfeasance is still “under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act.” Restatement (Second) of Torts § 302 cmt. a (1965) (emphasis added); Seebold v. Prison Health Servs., Inc., 57 A.3d 1232, 1246 (Pa.2012).

Creation of Risk

A duty is not, however, transposed through mere assertions of misfeasance. As the Third Restatement explains:
An actor’s conduct creates a risk when the actor’s conduct or course of conduct results in greater risk to another than the other would have faced absent the conduct.
Restatement (Third) of Torts: Phys. & Emot. Harm § 7 cmt. o. (2010) (emphasis added); see also Lee v. Clorox Int’l Co., 854 F.Supp.2d 1311, 1315 (S.D.Ga.2010), aff'd, 466 Fed.Appx. 826 (11th Cir.2012) (“[F]or a defendant’s conduct to create a risk, the defendant must take an affirmative step that goes directly and necessarily to the creation of a foreseeable risk.”). While such conduct may include “exposing another to the improper conduct of third parties,” Restatement (Third) of Torts: Phys. & Emot. Harm § 7 cmt. o., the third party’s criminal conduct will be foreseeable only if “the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a ... crime.” Restatement (Second) of Torts § 448 (1965).
Within this spectrum, Comment e. provides four examples of affirmative acts sufficient to sustain liability for the criminal acts of another. Among these illustrations, Paragraph D. provides that a duty may arise “[w]here the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct.”[9] *1149 (Emphasis added). In assessing the applicability of this principle, factors to be considered include:
[T]he known character, past conduct, and tendencies of the person whose intentional conduct causes the harm, the temptation or opportunity which the situation may afford him for such misconduct, the gravity of the harm which may result, and the possibility that some other person will assume the responsibility for preventing the conduct or the harm, together with the burden of the precautions which the actor would be required to take.
Restatement (Second) of Torts § 302B cmt. f. (1965). As pleaded, the allegations of the complaint fall within the scope of Comment f.
Florida courts have yet to apply Paragraph D. in this context. Shurben cited to section 302B, but the case can also be read as one where a duty arose out of a business relationship — that of a car rental agency and a customer. 676 So.2d at 468. In Shurben, a British tourist sued a rental car dealership after she was accosted and shot by unknown criminals while driving her rental car in Miami. The defendant dealership knew that the plaintiffs rental car bore a license plate that readily identified it as a rental vehicle; it was alleged that there had been “repeated instances of criminal activity directed at tourists in rental cars in certain areas of Miami and that [the defendant] was aware of those instances.” Id. In finding that the defendant dealership had a duty to warn the plaintiff of the foreseeable criminal conduct, the third district discussed section 302B and held that, “[b]ased on the knowledge it had on hand, [the defendant] should have realized that criminals were targeting tourist car renters in certain areas of Miami and that a reasonable rental company in possession of those facts would understand that its customers would be exposed to unreasonable risk of harm if not warned.” Id. (footnote omitted).

Application of Public Policy

Even if we were to apply section 302B in the way urged by appellants, for public policy reasons we would nonetheless hold that the Merhiges violated no legal duty toward the appellants.
The issue of legal duty in a negligence case asks “whether the plaintiffs interests are entitled to legal protection against the defendant’s conduct.” Prosser & Keeton on the Law of Torts § 53, at 357. A court’s decision as to whether a legal duty in negligence exists necessarily involves questions of public policy. As the Florida Supreme Court recognized pre-McCain, the duty inquiry in a negligence case involves weighing “ ‘the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.’” Rupp v. Bryant, 417 So.2d 658, 667 (Fla.1982) (quoting W. Prosser, The Law of Torts § 53, at 325-26 (4th ed. 1971)); see also Gross v. Family Servs. Agency, Inc., 716 So.2d 337, 338 (Fla. 4th DCA 1998). We explained in Biglen v. Florida Power & Light Co., 910 So.2d 405 (Fla. 4th DCA 2005):
Finding that a legal duty exists in a negligence case involves the public policy decision that a “defendant should bear a given loss, as opposed to distributing the loss among the general public.” Levy v. Fla. Power & Light Co., 798 So.2d 778, 780 (Fla. 4th DCA 2001), rev. den. 902 So.2d 790 (Fla.2005). A legal “[d]uty is an allocation of risk determined by balancing the foreseeability of harm, in light of all the circumstances, against the burden to be imposed.” Id. (quoting Vaughan v. Eastern Edison *1150 Co., 48 Mass.App.Ct. 225, 719 N.E.2d 520, 528 (1999)).
Id. at 409.
Considerations of public policy are appropriate in determining whether a negligence cause of action will lie. For example, in Raisen v. Raisen, 379 So.2d 352, 354-55 (Fla.1979), the Supreme Court relied upon public policy reasons to hold that the doctrine of interspousal tort immunity was still viable in Florida. Similarly, the Court evaluated policy considerations in Ard v. Ard, 414 So.2d 1066, 1067 (Fla.1982), to hold that in a negligence action brought by an unemancipated minor child against a parent, “the doctrine of parental immunity is waived to the extent of the parent’s available liability insurance coverage.” It is highly unlikely that, in McCain, the Supreme Court silently abandoned the common law function of a court to consider public policy in deciding whether a legal duty in negligence exists. See Puryear v. State, 810 So.2d 901, 905 (Fla.2002) (holding that the Supreme Court “does not intentionally overrule itself sub silentio”).
Public policy considerations may operate to limit legal duty under Restatement (Third) of Torts: Physical & Emotional Harm § 7(b) (2010), which provides:
In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification.
Section 7(b) contemplates that a rule limiting duty for public policy reasons is appropriate “only when a court can promulgate relatively clear, categorical, bright-line rules of law applicable to a general class of cases.” Restatement (Third) of Torts: Phys. & Emot. Harm § 7, cmt. a. Comment j to section 7 explains:
A no-duty ruling represents a determination, a purely legal question, that no liability should be imposed on actors in a category of cases. Such a ruling should be explained and justified based on articulated policies or principles that justify exempting these actors from liability or modifying the ordinary duty of reasonable care. These reasons of policy and principle do not depend on the foreseeability of harm based on the specific facts of a case. They should be articulated directly without obscuring references to foreseeability.
(Emphasis added).[10]
Here, a public policy reason militates for a finding of no legal duty even assuming that a McCain/section 302B foreseeability analysis leads to the conclusion that the shootings were a foreseeable result of the Merhiges’ conduct. In Raisen and Ard, the Supreme Court considered public policy when confronting tort issues in the family context, and in Ard the Court expressed its great concern that litigation between family members was an intrusion “that might adversely affect the family relationship.” 414 So.2d at 1067. Here, the essence of the negligence claim is that the Merhiges invited their deeply troubled child to a family gathering, knowing of his difficulties with family members. Family *1151 members with psychological or behavioral problems are a common occurrence in Florida and elsewhere. Families should be encouraged to include a troubled family member in the family circle. A holding that the Merhiges owed a legal duty to the members of their family and extended family in this case would discourage families from providing a haven to troubled relatives for fear of civil liability. The result would be to foist those most in need of family interaction on the governmental and charitable social service networks, thereby thrusting a family problem into the hands of society at large, where unhappy outcomes are all too common. Difficult and tragic cases such as this one should not set the standard for the entire universe of family interaction. Cf. Alva v. Cook, 49 Cal.App.3d 899, 123 Cal.Rptr. 166, 170 (1975) (“[I]t would be unjust and morally wrong and against public policy to discourage humane and natural relationships between members of a family who are sensitive to and generous in the treatment of less fortunate members of their family.”).

Affirmed.

DAMOORGIAN, C.J., and TAYLOR, J., concur.

. We sua sponte amend the order of February 8, 2013, consolidating these two cases for oral argument purposes only and further consolidate the two cases for all purposes.

. In obtaining the injunction, the sister's mother-in-law stated that Paul’s sister told her "she was afraid that [Paul] was one day going to kill both her and her [other] sister.”

. Winn-Dixie Stores, Inc. v. Johstoneaux, 395 So.2d 599, 599 n. 1 (Fla. 3d DCA 1981); Stevens v. Jefferson, 436 So.2d 33, 34-35 (Fla.1983) (tavern owner); Adika v. Beekman Towers, Inc., 633 So.2d 1170, 1170-71 (Fla. 3d DCA 1994) (innkeeper-guest).

. Lillie v. Thompson, 332 U.S. 459, 460, 68 S.Ct. 140, 92 L.Ed. 73 (1947) (employer could be liable for sending female employee "to work in a place he knew to be unsafe”); Bardy v. Walt Disney World Co., 643 So.2d 46, 47—48 (Fla. 5th DCA 1994) (negligence available where the defendant’s security guard ejected a drunken employee from its premises and ordered him to remove his car, where the employee stated he was too drunk to drive); K.M. ex rel. D.M. v. Publix Super Mkts., Inc., 895 So.2d 1114, 1117 (Fla. 4th DCA 2005).

. Sams v. Oelrich, 717 So.2d 1044, 1048 (Fla. 1st DCA 1998) (special relationship between sheriff and prisoner); Frett v. Gov’t of Virgin Islands, 839 F.2d 968, 975-76 (3d Cir.1988), abrogated on other grounds by Ngiraingas v. Sanchez, 495 U.S. 182, 186 n. 4, 110 S.Ct. 1737, 109 L.Ed.2d 163 (1990) (prison warden); Taylor v. Slaughter, 171 Okla. 152, 42 P.2d 235, 236-37 (1935).

. Bradley Ctr., Inc. v. Wessner, 250 Ga. 199, 296 S.E.2d 693, 696 (1982) (private mental health hospital held civilly liable for murder by patient under the hospital’s control); White v. United States, 780 F.2d 97, 103 (D.C.Cir.1986) (mental hospital and its personnel); Sylvester v. Nw. Hosp. of Minneapolis, 236 Minn. 384, 53 N.W.2d 17, 20-21 (1952).

. Nova Se. Univ., Inc. v. Gross, 758 So.2d 86, 89-90 (Fla.2000) (university liable for student assaulted while doing a mandatory, off-cam *1146 pus internship); Concepcion v. Archdiocese of Miami, 693 So.2d 1103, 1104-05 (Fla. 3d DCA 1997); Schultz v. Gould Acad., 332 A.2d 368, 370-71 (Me.1975).

. Section 302B is a "special application” of Restatement (Second) of Torts § 302(b), which provides that "[a] negligent act or omission may be one which involves an unreasonable risk of harm to another through ... the foreseeable action of the other, a third person, an animal, or a force of nature.” Restatement (Second) of Torts § 302(b) (1965) (emphasis added).

. The other three examples include:
(1)"Where the actor’s affirmative act is intended or likely to defeat a protection which the other has placed around his person or property for the purpose of guarding them from intentional interference,”
(2) “Where the actor entrusts an instrumentality capable of doing serious harm if misused, to one whom he knows, or has strong reason to believe, to intend or to be likely to misuse it to inflict intentional harm,” or
(3)"Where the actor acts with knowledge of peculiar conditions which create a high degree of risk of intentional misconduct.”
Restatement (Second) of Torts § 302B, cmt. e, para. C, E, H (1965).

. Interestingly, the Third Restatement disapproves of the practice of using foreseeability in no-duty determinations. Restatement (Third) of Torts: Phys. & Emot. Harm § 7, cmt. j (2010). The Third Restatement "limits no-duty rulings to articulated policy or principle in order to facilitate more transparent explanations of the reasons for a no-duty ruling and to protect the traditional function of the jury as factfinder.” Id.; see generally W. Jonathan Cardi, Purging Foreseeability: The New Vision of Duty and Judicial Power in the Proposed Restatement (Third) of Torts, 58 Vand. L. Rev. 739 (2005).