#29131-a-MES
**2021 S.D. 69**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JOHN KOENIG and KAREN KOENIG,        Plaintiffs and Appellants,

    v.

DONALD G. LONDON,        Defendant,

    and

BONITA S. LONDON,        Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
BRULE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JAMES A. POWER
Judge

* * * *

ANDREW T. FICK
DEREK A. NELSEN
ERIC PREHEIM of
Fuller, Williamson, Nelson,
   & Preheim, LLP
Sioux Falls, South Dakota        Attorneys for plaintiffs
        and appellants.


RICHARD L. TRAVIS
AARON A. FOX of
May & Johnson, P.C.
Sioux Falls, South Dakota        Attorneys for defendant
        and appellee.

* * * *

ARGUED
OCTOBER 5, 2020
OPINION FILED **12/22/21**

#29131

SALTER, Justice

[¶1.]    In an underlying criminal case, Donald London was convicted of aggravated assault against a law enforcement officer for shooting and injuring Sergeant John Koenig of the South Dakota Highway Patrol. Sergeant Koenig and his wife brought negligence and loss of consortium claims against Donald and his mother, Bonnie London, based on events leading up to the shooting. The circuit court granted Bonnie's summary judgment motion after concluding she did not owe a legal duty to control or supervise her adult son and should not be subject to liability for his criminal conduct. The Koenigs appeal, alleging the circuit court erred when it granted the summary judgment motion. We affirm.

## Background

[¶2.]    Donald London was 42 years old when he shot Sergeant Koenig on January 7, 2015, outside of a rural Kimball farmhouse that belonged to Donald's maternal grandmother. Although Donald was originally from the Kimball area, he moved to Pierre with his mother when his parents divorced. After finishing high school, Donald moved away and lived out of state. He returned in late December 2014 to visit his family and because his grandmother was ill. While she was receiving care in Sioux Falls, Donald stayed alone at her farmhouse. Donald's father, Michael (Mike) London, lived in Kimball, and Bonnie[1] lived in Pierre, though she was staying in Sioux Falls caring for her mother at nearly all times relevant to this case.

---

1.    It appears "Bonnie" is a nickname for her actual name, which is "Bonita."

[¶3.]		Following the death of his wife three years earlier, Donald was diagnosed with paranoid schizophrenia.[2] He had previously sought treatment and was prescribed medication to address his mental health condition. The record includes references to Donald being subject to one or more "mental health holds," though it is not clear whether these resulted in involuntary commitment or inpatient care. As a result of his mental illness, Donald's thoughts can become detached from reality and, at times, they have included his belief that his deceased wife is alive and being held captive by various law enforcement or intelligence agencies. The details of Donald's criminal history are not included in the record, but it appears undisputed that he is prohibited from lawfully possessing a firearm as a result of a previous felony conviction.

[¶4.]		In the days leading up to the shooting, law enforcement officers had regular and frequent contact with Donald. On the evening of January 5, a local bar employee contacted law enforcement to report Donald's involvement in an altercation at the bar. Donald called Bonnie after he left the bar that night. His truck had broken down in bitter cold temperatures, and Bonnie could tell he was intoxicated and hysterical. Bonnie pleaded with him over the telephone to stay with the truck but could hear him walking away. She contacted Mike and asked him to set out and look for their son. Officers later found Donald and released him to Mike who took him to his grandmother's farmhouse.

[¶5.]		At 6:00 a.m. the next day, Bonnie received a telephone call from her daughter, reporting Donald was still experiencing difficulty with his mental health.

---

2.	Donald's wife took her own life.

Unable to travel to Kimball from Sioux Falls due to poor weather conditions, Bonnie called local emergency officials and asked them to send an ambulance to the farmhouse to assist Donald. Local law enforcement officers learned of the request and called Mike who advised that Donald was in the basement of the farmhouse with knives and a pistol.

[¶6.] Officers went to the farmhouse and seized at least three firearms from the main floor. An officer standing at the top of the basement stairwell saw Donald in the basement holding a rifle. The officer drew his service weapon, pointed it at Donald and told him to drop the weapon. Donald dropped the rifle and held up his hands, but then disappeared. He reappeared, but only showed one hand to the officer. Brule County Sheriff Darrell Miller was eventually able to convince Donald to come upstairs peacefully. Officers subsequently recovered several additional firearms from the basement and locked them in a gun safe at the farmhouse, leaving the key with Mike.

[¶7.] As the officers prepared to leave, Chamberlain Chief of Police Joe Hutmacher, with whom Donald had a contentious but unrelated history, arrived at the farmhouse. Chief Hutmacher informed the officers that Donald was prohibited from lawfully possessing firearms because of a previous felony conviction. Prompted by this information, Sheriff Miller contacted agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and notified them that Donald's weapons had been secured in a gun safe. The call did not lead to any imminent response by ATF agents.

[¶8.] Once upstairs, Donald agreed to a mental health hold and took his medication. *See* SDCL 27A-10-3 (authorizing a "peace officer" to apprehend a mentally ill person "believe[d to] require[ ] emergency intervention" and to "transport the person to an appropriate . . . facility"). However, officers ultimately elected not to seek a mental health hold after Donald agreed to have his father take him for an immediate mental health evaluation. Initially, Donald and Mike intended to drive to Sioux Falls, but the plans changed after Bonnie learned it would be quicker to have Donald evaluated in Mitchell. The Mitchell provider did not admit Donald for inpatient treatment and, according to Bonnie, advised Donald to quit taking his antipsychotic medicine and not drink any alcohol until his follow-up appointment six days later. Mike and Donald returned to the farmhouse later that day. Bonnie advised that she would finally be able to travel to Kimball the following day and assist in Donald's care.

[¶9.] The next morning, January 7, Sheriff Miller spoke with Mike several times by telephone about the current state of Donald's mental health. Sheriff Miller claims in an affidavit that Mike's demeanor changed from "calm and controlled" to "startled and excited based on Donald's erratic, irrational, and unpredictable behavior[.]" As related by Sheriff Miller, Mike attributed Donald's agitated state to a phone conversation between Bonnie and Donald that occurred while Bonnie was traveling from Sioux Falls to the farmhouse. The details of the phone conversation between Donald and Bonnie are disputed. However, the Koenigs allege that sometime between Sheriff Miller's first phone call with Mike at 11:11 a.m., and their second conversation, which took place at 11:48 a.m., Bonnie spoke with

-4-

Donald over the phone and told him that ATF agents were coming to the farmhouse. Bonnie has categorically denied making any such comment, and it is undisputed that ATF agents did not have a plan to visit the farmhouse.[3]

[¶10.] After the phone call with Bonnie, Mike told Sheriff Miller that Donald had left the farmhouse to retrieve firearms from Mike's house in Kimball. These were apparently the same guns law enforcement officers had locked in the gun safe at the farmhouse the previous day, purportedly moved to town by family members. Mike advised that Donald was threatening to shoot two specific officers with whom he had previously interacted—the officer who had pointed his weapon at Donald the previous day and also Chief Hutmacher. After returning to the farmhouse, Donald spoke with Sheriff Miller over the phone and repeated his threat to shoot the officers. Knowing that Donald may have access to weapons, Sheriff Miller took this threat seriously and prepared to confront Donald at the farmhouse, using deputies from his department along with officers from other agencies, including the Highway Patrol.

[¶11.] In the meantime, Bonnie arrived at the farmhouse from Sioux Falls around 3:00 p.m., shortly before officers began assembling at a nearby location. In

---

3.  As indicated below, Mike died before this action was commenced, and the circuit court confronted two hearsay issues in its determination of Bonnie's summary judgment motion. *See Chem-Age Indus., Inc. v. Glover*, 2002 S.D. 122, ¶ 18, 652 N.W.2d 756, 765 ("[T]he focus in summary judgment hearings centers on the existence of admissible and probative evidence to support the challenged claim or defense." (citing *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997))). The court ultimately determined that the statement about the ATF was admissible as an admission by Bonnie and an excited utterance by Mike. That evidentiary question is not before us in this appeal, and we express no opinion on the court's determination.

Donald's underlying criminal case, she testified that she observed Donald speaking calmly on the phone to Sheriff Miller.[4] Bonnie then spoke briefly with Mike and Donald before Mike left to seek medical care at a local clinic. However, he quickly returned and reported seeing a number of law enforcement vehicles near the farmhouse. Bonnie was initially skeptical and suspected, incorrectly, that the vehicles actually belonged to hunters. After driving out of the farmyard to investigate, Bonnie was detained by officers who prevented her from communicating with Donald for the duration of what became a law enforcement standoff with Donald and Mike.

[¶12.] At or around the same time Bonnie was being detained, Sergeant Koenig and other state troopers fanned out around the farmhouse area and established a perimeter. Sergeant Koenig was positioned behind a tin shed when he saw Donald, armed with a rifle, advancing on a position occupied by another trooper. Concerned that his colleague may be unaware of Donald's movement, Sergeant Koenig announced his presence and gave Donald a command to drop his weapon and get on his knees. Donald initially complied, partially. He dropped his rifle, but he walked backwards toward the farmhouse instead of getting on his knees. Donald soon then got into his pickup truck, drove back to reclaim his previously-dropped weapon, and returned to the farmhouse. Once parked, Donald got out of the pickup and took a position behind it.

---

4. This testimony is part of the current record and was considered by the circuit court.

[¶13.] After realizing law enforcement had surrounded the home, Mike called and accused Sheriff Miller of distracting him and Donald using telephone conversations while officers surreptitiously established the perimeter. Angered by the perceived betrayal, Mike told Sheriff Miller that "there's going to be some shots fired today." Mike then emerged from the farmhouse and yelled at Donald to "shoot those sons of bitches." Donald told the officers, "I'm going to die today. You're going to die today." He then began firing at Sergeant Koenig and the other trooper, both of whom were using separate sheds to provide cover.

[¶14.] Sergeant Koenig returned fire, and the gun battle continued until one of Donald's rounds pierced the metal shed Sergeant Koenig was using for cover and struck him in the left shoulder blade. As he lay on his back, seriously injured, Sergeant Koenig used his foot to hook the sling of his dropped rifle and rearmed himself in the event Donald continued the attack at close range. Sergeant Koenig was also able to summon assistance using his telephone and radio. He was medically evacuated a short time later and, fortunately, survived his injuries.[5] Donald ultimately surrendered to authorities approximately 17 hours later.

[¶15.] Both Donald and Mike were charged with criminal offenses for their conduct in connection with the standoff and shooting. Mike passed away ten months after the incident and before completion of the criminal proceeding against him.

---

5. Sergeant Koenig has since retired from the South Dakota Highway Patrol, marking a thirty-year law enforcement career. He continues his service in retirement as a part-time Brule County deputy sheriff.

[¶16.] Donald reached a plea agreement with prosecutors and pled guilty but mentally ill to three counts of aggravated assault against a law enforcement officer. *See* SDCL 22-18-1.05. One count related to Sergeant Koenig's shooting and the other two involved Donald pointing a firearm at other officers who were not injured. The sentencing court[6] imposed sentences for the three offenses totaling 30 years in the state penitentiary with an additional 45 years suspended.

[¶17.] Once the criminal proceedings were completed, Sergeant Koenig and his wife, Karen, brought this civil action against Donald and Bonnie.[7] With regard to Bonnie, the Koenigs asserted a general negligence claim and further alleged that she negligently supervised Donald and negligently entrusted him with firearms. In their view, Bonnie breached a legal duty by falsely telling Donald that the ATF was coming to the farmhouse, causing Donald's mental state to "spiral out of control." The Koenigs also alleged that Bonnie assumed a duty to supervise Donald's conduct and effectively entrusted him with weapons.[8]

[¶18.] Bonnie moved for summary judgment on the negligence claims, and the circuit court granted the motion. The court determined that Bonnie did not owe a legal duty to the Koenigs because she lacked sufficient control over her emancipated adult son and because his act of shooting Sergeant Koenig was not foreseeable. The court also concluded that Bonnie did not assume a duty to

---

6. The Honorable Bruce V. Anderson, Circuit Court Judge.

7. Mike's estate and Donald's grandmother were also named as defendants initially, but the Koenigs later dismissed those claims.

8. In addition to the negligence claims, Karen Koenig asserted a derivative loss of consortium claim.

supervise Donald and that she did not have control over the firearms she was alleged to have entrusted to Donald.

[¶19.] The Koenigs raise the following issues on appeal,[9] which we restate as follows:

1. Whether the circuit court erred when it determined that Bonnie did not owe a duty to control Donald or prevent his misconduct.

2. Whether the circuit court erred when it determined Bonnie did not undertake a gratuitous duty to supervise Donald.[10]

## Standard of Review

[¶20.] "We review a circuit court's entry of summary judgment under the de novo standard of review." *Zochert v. Protective Life Ins. Co.*, 2018 S.D. 84, ¶ 18, 921 N.W.2d 479, 486 (quoting *Harvieux v. Progressive N. Ins. Co.*, 2018 S.D. 52, ¶ 9, 915 N.W.2d 697, 700). "On appeal, we must 'determine whether genuine issues of

---

9. Though the circuit court's decision granting Bonnie's motion for summary judgment did not resolve the Koenigs' remaining claims against Donald, the court certified it as final in a detailed, four-page order. *See* SDCL 15-6-54(b) (Rule 54(b)) (allowing the entry of final judgment as to some but fewer than all claims). The court's order, entered pursuant to a stipulation between the parties here, stated the essential Rule 54(b) principles and applied them specifically to the facts of this case, explaining why the entry of final judgment was appropriate under these particular circumstances, including the parties' assessment that Donald was, in their words, "judgment proof." We believe the court utilized the correct rules, and its decision to certify its summary judgment order as final was within its discretion. *See Nelson v. Estate of Campbell*, 2021 S.D. 47, ¶¶ 27–29, 963 N.W.2d 560, 568–69 (discussing Rule 54(b) procedure); *Huls v. Meyer*, 2020 S.D. 24, ¶¶ 16–20, 943 N.W.2d 340, 344–45 (same); *Stromberger Farms, Inc. v. Johnson*, 2020 S.D. 22, ¶¶ 21–23, 942 N.W.2d 249, 255–57 (same).

10. From our review of the Koenigs' submissions on appeal, it appears they have abandoned their negligent entrustment claim.

material fact exist and whether the law was applied correctly.'" *Blanchard v. Mid-Century Ins. Co.*, 2019 S.D. 54, ¶ 16, 933 N.W.2d 631, 636 (quoting *Western Nat'l Mut. Ins. Co. v. Gateway Bldg. Sys., Inc.*, 2016 S.D. 85, ¶ 7, 887 N.W.2d 887, 890). "The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party." *Id.* (quoting *Saathoff v. Kuhlman*, 2009 S.D. 17, ¶ 11, 763 N.W.2d 800, 804). "We will affirm a circuit court's decision so long as there is a legal basis to support its decision." *Id.* (quoting *Heitmann v. Am. Family Mut. Ins. Co.*, 2016 S.D. 51, ¶ 8, 883 N.W.2d 506, 509).

## Analysis and Decision

### *Special Relationship and the Duty to Control*

[¶21.]        "Tort liability depends upon the existence and breach of [a] duty . . . ." *E.P. v. Riley*, 1999 S.D. 163, ¶ 24, 604 N.W.2d 7, 14 (quoting *Tipton v. Town of Tabor*, 1997 S.D. 96, ¶ 12, 567 N.W.2d 351, 357). "The existence of a duty is a threshold issue in any case of tort liability. Whether a duty exists is a matter of law for the court to determine." *Id.* (citations omitted).

[¶22.]        "Generally, the law imposes no duty to prevent the misconduct of a third person." *Id.* ¶ 26, 604 N.W.2d at 14. However, "a duty to protect a person from the unlawful acts of a third person could arise if the following two elements [a]re met: (1) the existence of a special relationship . . . and (2) a finding that the intentional criminal acts were foreseeable." *Walther v. KPKA Meadowlands Ltd. P'ship*, 1998 S.D. 78, ¶ 41, 581 N.W.2d 527, 535; *see also Kirlin v. Halverson*, 2008

S.D. 107, ¶ 31, 758 N.W.2d 436, 448–49 (listing both elements); *Iverson v. NPC Intern., Inc.*, 2011 S.D. 40, ¶ 16, 801 N.W.2d 275, 280 (same).

[¶23.]     The special relationship could be one of two varieties—a relationship between the actor-defendant and the plaintiff claiming injuries or a relationship between the actor-defendant and the third party alleged to have caused the injuries. For either type of relationship, § 315 of the Restatement (Second) of Torts may impose a duty upon the actor to control the conduct of a third person:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another *unless* (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection.

(Emphasis added.); *see also Kirlin*, 2008 S.D. 107, ¶ 32, 758 N.W.2d at 449 (noting that "[t]he Restatement (Second) of Torts, Section 315 reflects this Court's 'special relationship' prong" of the duty inquiry).

[¶24.]     Several of our prior cases have identified instances in which special relationships existed.  *See, e.g.*, *Kirlin*, 2008 S.D. 107, ¶ 12, 758 N.W.2d 436, 444 (employer-employee relationship); *E.P.*, 1999 S.D. 163, ¶ 30, 604 N.W.2d at 15 (foster parent-minor child relationship); *Small v. McKennan Hosp.*, 437 N.W.2d 194, 199–200 (S.D. 1989) (business invitee-landowner relationship); *see also* Restatement (Second) of Torts §§ 314A, 320 (1965) (listing special relationships between the actor and the plaintiff); Restatement (Second) of Tort §§ 316–319 (listing special relationships between the actor and the third party alleged to have caused the injuries).

[¶25.] Here, the circuit court determined that no special relationship existed between Bonnie and Donald. We agree. Donald was a 42-year-old emancipated adult at the time of the shooting. He lived by himself out of the state and had not resided with Bonnie since high school. Donald was not the subject of a guardianship, and there were no restrictions on his movement or conduct.

[¶26.] As his mother, Bonnie was involved and supportive of Donald's effort to address his mental health. But this relationship appears to be no more special or remarkable than would be the case for any parent concerned for the health of an adult child. *See* SDCL 25-5-14 (stating that, except for the acts of minor children as contained in SDCL 25-5-15, "neither parent nor child is answerable as such, for the act of the other"). Under the circumstances, the circuit court correctly determined that Bonnie's relationship with Donald did not subject her to liability for Sergeant Koenig's injuries.

### Actor's Conduct Increasing the Risk of Harm

[¶27.] The determination that Bonnie did not owe a duty by virtue of a special relationship to prevent Donald's misconduct does not end our inquiry. Indeed, the Koenigs do not claim the existence of a special relationship as the basis for their principal duty argument. Instead, the Koenigs argue that Bonnie is subject to liability solely because the consequences of her statement to Donald about the ATF were foreseeable.

[¶28.] Though it is generally true that existence of a duty depends upon the foreseeability of an injury, it does not automatically follow that Bonnie is subject to

liability here. The Koenigs' contrary view is based upon several of our previous decisions, but this reliance is misplaced for various reasons.

[¶29.]     Some of these purported "foreseeability-only" cases the Koenigs cite involve duty questions that are not based entirely on foreseeability at all, but rather also involve the existence of special relationships. *See, e.g.*, cases cited *supra* ¶ 24. Other cases are inapposite because, unlike this case, the decisions do not involve an effort to hold an actor liable for the conduct of a third party. *See, e.g.*, *Mark, Inc. v. Maguire Ins. Agency, Inc.*, 518 N.W.2d 227 (S.D. 1994); *Thompson v. Summers*, 1997 S.D. 103, 567 N.W.2d 387; *Pierce v. City of Belle Fourche*, 2001 S.D. 41, 624 N.W.2d 353; *Johnson v. Hayman & Assoc., Inc.*, 2015 S.D. 63, 867 N.W.2d 698; *Zerfas v. AMCO Ins. Co.*, 2015 S.D. 99, 873 N.W.2d 65. And, as the circuit court noted, our decisions have little or no utility where they involve a third party's *negligent* conduct, instead of *intentional or intentionally criminal* conduct. *See, e.g.*, *McGuire v. Curry*, 2009 S.D. 40, 766 N.W.2d 501; *see also* Restatement (Second) Torts § 302B, cmt. d. (1965) (stating that intentional conduct is less foreseeable than negligent conduct, "particularly where the intentional conduct is a crime").

[¶30.]     Nevertheless, the broad distinction the Koenigs suggest—imposing a duty because of an actor's conduct, rather than a special relationship—does find support in the law. But subjecting an actor-defendant to liability in instances involving the intentionally criminal conduct of another depends upon a particular set of rules that require a heightened showing of foreseeability.

[¶31.]     For instance, a Florida District Court of Appeal considered the effect of affirmative conduct on the question of legal duty in a decision that presented

similar arguments, and even facts, to the case before us. *See Knight v. Merhige*, 133 So. 3d 1140 (Fla. Dist. Ct. App. 2014). The defendants in *Merhige* were the parents of an adult son who killed several family members at a Thanksgiving Day dinner. The son had a history of violent behavior and involuntary commitments. He lived with his parents[11] and was prescribed psychotropic medication. Despite the outright refusal of some extended family members to be in the son's presence for fear of violence, the son's parents invited him to a Thanksgiving Day dinner at the home of relatives, unilaterally and without notice to others. Tragically, the son shot and killed four family members soon after arriving for the dinner, and the estates of the victims commenced an action against his parents.

[¶32.] The Florida appeals court concluded, as we have above, that the parents did not owe a duty to prevent their son's criminal conduct under a special relationship theory, but the court also faced the same essential affirmative conduct argument that the Koenigs have made here.[12] Citing to the Restatement (Second) of Torts § 302B, the *Merhige* court concluded that there may be instances in which an actor may be negligent "if the actor realizes or should realize that [the actor's act or omission] involves an unreasonable risk of harm to another through the conduct

---

11. Unlike the facts here, the parents in *Merhige* "supervised, controlled, directed and managed the manner in which [their son] lived, including providing for and controlling [his] accommodations, mental health treatment, transportation, and available spending money." 133 So. 3d at 1142 (cleaned up).

12. The *Merhige* court described the plaintiffs' argument in the following terms: "Under this approach, foreseeability is everything and legal duty is but a minimal legal threshold requirement for opening the courthouse door." *Id.* at 1147.

of the other or a third person which is intended to cause harm, even though such conduct is criminal." *Id.* at 1147 (quoting Restatement (Second) of Torts § 302B (1965)). As Comment e of § 302B explains:

> In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct; *or where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account.*

(Emphasis added.)

[¶33.] Indeed, the Third Restatement of Torts has clarified the relationship between an actor's affirmative conduct as described in Comment e and the imposition of a duty to control a third party and prevent misconduct incidental to a special relationship as described in § 315 of the Second Restatement:

> Section 315 of the Restatement Second of Torts contributed to frequent judicial pronouncements . . . that absent a special relationship an actor owes no duty to control third parties. *Section 315, however, must be understood to address only an affirmative duty to control third parties. It did not address the ordinary duty of reasonable care with regard to conduct that might provide an occasion for a third party to cause harm.* The Restatement Second of Torts § 302B, Comment e, provides for a duty of care when "the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such [third-party] misconduct." Section 449 of the Second Restatement also contemplated liability, without regard to any special relationship, for acts that are negligent because of the risk of the third party's conduct.

*Merhige*, 133 So. 3d at 1147–48 (alterations in original) (quoting Restatement (Third) of Torts: Phys. & Emot. Harm § 37 cmt. d. (2012)).

[¶34.] We have previously applied these Restatement rules in much the same way, though the negligence theory involved an actor's alleged omissions, and not

affirmative conduct. In *Smith ex rel. Ross v. Lagow Const. & Dev. Co.*, 2002 S.D. 37, 642 N.W.2d 187, the estate of a tenant who had been murdered in her leased apartment sued the landlord, alleging it was negligent for not changing the locks when the tenant reported her key missing. We determined first that the landlord's policy for changing the locks on its tenants' apartments did not create a special relationship and, therefore, the landlord was under no duty to protect tenants from the criminal acts of a third party. *Id.* ¶¶ 12–14 (plurality opinion) (citing Restatement (Second) of Torts § 314A (1965)); *Id.* ¶ 27 (Sabers, J., concurring in result).[13]

[¶35.]     However, we recognized that the special relationship test was not the only basis for determining the existence of a duty and continued our analysis, ultimately applying the principle stated in § 302B of the Second Restatement. *Id.* ¶¶ 14–17 (plurality opinion); *Id.* ¶ 30 (Sabers, J., concurring in result). Relying upon § 302B, we held that a duty to protect others from harm "may arise if a person's affirmative acts or omissions create a foreseeable high risk of harm[.]"[14]

---

13.     In *Lagow*, Justice Sabers joined two other members of the Court to hold that the circuit court had incorrectly granted summary judgment on the duty question. Though Justice Sabers indicated his preference for having the disputed material facts associated with the duty question resolved by a jury rather than a court, he indicated his agreement with the principal points highlighted here, namely, that the special relationship test is not the sole basis upon which a person could be subject to liability for the acts of another and that the application of the Second Restatement of Torts § 302B could subject a defendant to liability for the acts of third parties in exceptional circumstances. In an effort to assure clarity, our citations to *Lagow* will cite both to the plurality opinion and to Justice Sabers's writing.

14.     As indicated above, the relevant portion of Comment e of § 302B addresses affirmative conduct and does not mention omitted conduct.

*Id.* ¶ 16 (plurality opinion); *see id.* ¶ 30 (Sabers, J., concurring in result); *see also Englund v. Vital*, 2013 S.D. 71, ¶ 21, 838 N.W.2d 621, 629 (noting "[s]ection 302B of Restatement (Second) of Torts (1965) creates an exception to the general rule that one has no duty to protect another from crime" (citing *Lagow*, 2002 S.D. 37, ¶ 16, 642 N.W.2d at 191)).

[¶36.]     When the Florida court in *Merhige* reached a similar juncture in its analysis, it concluded that the defendant's parents did not owe the plaintiffs a duty. In so doing, the court considered several formulations for determining whether an actor created an increased risk of harm, including the Third Restatement's test that looks to whether the "actor's conduct . . . results in greater risk to another than the other would have faced absent the conduct." *Merhige*, 133 So. 3d at 1148 (emphasis omitted) (quoting Restatement (Third) of Torts: Phys. & Emot. Harm § 7 cmt. o. (2010)). The court also cited a federal district court's conclusion that a person creates a risk by taking "an affirmative step that goes directly and necessarily to the creation of a foreseeable risk." *Id.* (quoting *Lee v. Clorox Int'l Co.*, 854 F.Supp.2d 1311, 1315 (S.D. Ga. 2010)).

[¶37.]     But creating the risk through an affirmative act is only one aspect of a §302B-imposed duty, and the *Merhige* court held that even where an actor's conduct exposes another to risk of harm from a third party:

> [T]he third party's criminal conduct will be foreseeable only if "the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a . . . crime."

*Id.* (second alteration in original) (quoting Restatement (Second) of Torts § 448 (1965)); *see also Hurn v. Greenway*, 293 P.3d 480, 481 (Alaska 2013) (applying § 302B to hold that "[a] murder was not the foreseeable result of suggestive dancing" when the defendant danced provocatively with the wife of a man the defendant knew to be jealous and threatening).

[¶38.]     Moreover, the likelihood of a third party's criminal or intentional misconduct must extend beyond mere plausibility. *See Hurn*, 293 P.3d at 485 (noting that the illustrations to Comment e of § 302B suggest "that the degree of risk required to impose liability must be closer to 'certainty of harm' than the mere suspicion of danger"). As stated in Comment a to the Restatement (Second) of Torts § 449, "the mere possibility or even likelihood that there may be such misconduct is not in all cases sufficient to characterize the actor's conduct as negligence." Restatement (Second) of Torts § 449 cmt. a. (1965).[15] Rather, it is only when the actor's conduct "has created or increased the risk of harm through the misconduct, that he becomes negligent." *Id.* And, as we stated in *Lagow*, that conduct must create a "foreseeable *high* risk of harm." 2002 S.D. 37, ¶ 16, 642 N.W.2d at 192 (plurality opinion) (emphasis added); *see id.* ¶ 30, 642 N.W.2d at 194 (Sabers, J., concurring in result).

---

15.  Sections 448 and 449 are included in the Second Restatement's set of rules addressing superseding causes. They are cited here not because we are determining the existence of a superseding cause but because they are often read together with § 302B. *See* Restatement (Second) of Torts § 449, cmt. a (1965) ("This Section should be read together with § 302B, and the Comments to that Section."); *Lagow*, 2002 S.D. 37, ¶ 30, 642 N.W.2d at 194 (Sabers, J., concurring in result) (citing § 448 in connection with the duty analysis).

[¶39.] Determining the foreseeable high risk of criminal conduct in this way is a logical extension of our decision in *Lagow*,[16] and applying these rules here, we conclude that Bonnie making a statement about the ATF coming to the farmhouse did not create a foreseeable high risk of criminal conduct. Our determination in this regard begins with the proper treatment of the facts implicated by Bonnie's motion for summary judgment.

[¶40.] Under our familiar summary judgment standard, we accord non-moving parties an evidentiary advantage by viewing the facts in their favor along with any related inferences. However, we require inferences from the evidence to be reasonable, not merely within the realm of possibilities. *See, e.g.*, *Veblen Dist. v. Multi-Cmty. Co-op. Dairy*, 2012 S.D. 26, ¶ 7, 813 N.W.2d 161, 164 ("The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party." (quoting *Dykstra v. Page Holding Co.*, 2009 S.D. 38, ¶ 23, 766 N.W.2d 491, 496)); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468, 112 S. Ct. 2072, 2083, 119 L. Ed. 2d 265 (1992) ("[T]he nonmoving party's inferences [must] be reasonable in order to reach the jury . . . .").

[¶41.] Although we must resolve the disputed fact about whether Bonnie told Donald the ATF was coming to the farmhouse in the Koenigs' favor, their principal inferential arguments characterizing Bonnie's conduct are contrary to the

---

16. We did not reach the merits of the foreseeability question in *Lagow*, but rather remanded the case with instructions to resolve certain factual questions central to determining the existence of a duty. *Lagow*, 2002 S.D. 37, ¶ 21, 642 N.W.2d at 193 (plurality opinion).

undisputed facts contained in the record. As described in their submissions, the Koenigs seem to assert that Donald's conduct was foreseeable to Bonnie because she acted *intentionally* to incite Donald:

> Bonnie knew that Donald was spiraling out of control . . . , knew that he had delusional beliefs that the police were holding his wife captive . . . , and knew that he had been in an armed encounter with police the day before . . . . Despite this knowledge, *Bonnie still chose to falsely tell Donald that the ATF was coming – a statement she knew would agitate Donald in his already delicate state.*

(Emphasis added.)

[¶42.] The idea that Bonnie made the statement about the ATF for the express purpose of "light[ing] Donald's fuse" and "agitat[ing]" his perilous mental state in order to endanger law enforcement officers is simply unsustainable. The undisputed facts indicate she spoke with Donald during a late morning telephone conversation on January 7. Bonnie was not in Kimball and arrived at the farmhouse later, in the afternoon. She had been in Sioux Falls during the events of January 5 and 6, caring for her mother and unable to travel to Kimball due to winter weather. To what extent she was aware of the details of the January 6 incident at the farmhouse where law enforcement officers removed guns from Donald's possession is unclear. But even if she knew all of the details, they still fail to support the claim that Bonnie understood there was a foreseeable high risk that Donald was actually going to shoot a police officer.

[¶43.] Despite his access to firearms, Donald did not act violently on January 6, and he listened to reason as Sheriff Miller successfully resolved the situation. In fact, although Donald suffers from paranoid schizophrenia and delusions, there is

no indication he had ever used deadly force before January 7. And even in the midst of the standoff, Donald initially complied with Sergeant Koenig's instructions to lay his rifle down before eventually returning to retrieve it.

[¶44.] Critically, however, Mike's own disposition began to fray around the same time. He telephoned Sheriff Miller and criticized the sheriff's decision to establish a law enforcement perimeter and portentously predicted that there would be gunfire. A short while later, the undisputed facts indicate that Mike exhorted Donald to violence by heedlessly shouting, "Shoot those sons of bitches." There is no basis to infer Bonnie could have foreseen any of this or that she could have acted to influence Donald at that point because she was being held incommunicado by law enforcement officers outside of the perimeter.

[¶45.] Although a duty to act reasonably to protect others from harm may arise even in the absence of a special relationship, as we recognized in *Lagow*, this is not such a case. Donald's mental health condition and delusions may have made his conduct unpredictable. But Bonnie's purported comments about the ATF did not create a foreseeable high risk that Donald would act criminally to harm Sergeant Koenig.

### *Gratuitous Duty to Supervise*

[¶46.] The Koenigs also allege that Bonnie undertook a gratuitous duty to supervise Donald through her involvement in his mental health care the day before the shooting and by arriving at the farmhouse before the shooting to help him.[17]

---

17. The Koenigs do not allege Bonnie "took charge" of Donald. *Compare Small*, 403 N.W.2d at 413–14 (holding parole agent did not take charge or control of
(continued . . .)

The argument invokes the common-law rule that we have recognized and sourced to the Second Restatement of Torts § 323:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if, (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

*See also Andrushchenko v. Silchuk*, 2008 S.D. 8, ¶ 24, 744 N.W.2d 850, 858.

[¶47.]     The circuit court determined that Bonnie's participation in Donald's care did not constitute a gratuitous duty to supervise Donald. Although she may have attempted to advise Donald, the court concluded the undisputed evidence in the record indicated that "at no time during January 5-7, 2015 did Donald relinquish his right to make his own decision concerning his health care or other conduct to Bonnie . . . ." We agree.

[¶48.]     Donald lived by himself and did not require his mother's care. In fact, Bonnie did not live in the same community as Donald. She lived in Pierre, and he was temporarily residing in Kimball, though for his adult life he had lived out of state. In addition, the court cited the undisputed facts that Donald had been released to Mike's custody after his two prior encounters with law enforcement on

---

(. . . continued)

parolee who kidnapped, raped, and murdered the plaintiff's wife); *with E.P.*, 1999 S.D. 163, ¶¶ 25–29, 604 N.W.2d at 14–15 (holding Department of Social Services employees had sufficient control over foster child to support common law duty to protect third parties); *see also* Restatement (Second) of Torts § 319 (1965) ("Duty of Those in Charge of Person Having Dangerous Propensities").

January 5 and 6, and that Bonnie was not in contact with Donald during the standoff. The Koenigs claim that "Bonnie voluntarily undertook a duty to supervise Donald" because she "decided that Donald did not need additional medical treatment" on January 6. However, Donald was independently evaluated by mental health providers in Mitchell who elected not to admit him to inpatient treatment and reportedly advised him to stop taking his medication, all without any involvement from Bonnie.

[¶49.] In the end, the Koenigs essentially claim that Sergeant Koenig's injury could have been avoided if Bonnie had sought a higher level of mental health intervention. However, this argument simply expresses a view of but-for causation, not voluntarily assuming a duty to supervise another adult. Additionally, the Koenigs have not cited any authority to support the view that a parent's role in an adult child's mental health care creates a duty to supervise the child, and compelling policy reasons counsel against accepting their argument here.[18] *See Kirlin*, 2008 S.D. 107, ¶ 52, 758 N.W.2d at 453 ("[P]ublic policy is a major consideration in identifying a legal duty." (citation omitted)).

---

18. The Koenigs' reliance on the federal district court decision in *Johnson v. Soldan*, No. 4:14-CV-04029-KES, 2016 WL 1574034 (D.S.D. Apr. 19, 2016), is misplaced. In *Soldan*, a 10-year-old was alleged to have negligently shot a guide during a hunting trip. The child's grandfather was named as a defendant and moved for summary judgment, claiming the child's father was exclusively responsible for supervising his son. The district court denied the motion based upon evidence in the record that suggested the child's grandfather and father had alternated supervisory responsibilities throughout the hunt. However, this fact-bound result has little persuasive bearing upon this case, in large part because Donald is not a minor and not subject to comparable supervision.

## Conclusion

[¶50.]     The circuit court did not err when it found Bonnie owed no duty to Sergeant Koenig under a general negligence theory because she was not in a special relationship with Donald.  Nor is Bonnie subject to a legal duty based upon her own conduct because it did not create a foreseeable high risk of harm.  The court also did not err when it determined that Bonnie did not gratuitously assume a duty to supervise Donald.  We affirm.

[¶51.]     JENSEN, Chief Justice, and KERN and DEVANEY, Justices, and GILBERTSON, Retired Chief Justice, concur.

[¶52.]     MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.